592 N.W.2d 798 (1999)
233 Mich. App. 604
In re DISCLOSURE OF JUROR NAMES AND ADDRESSES.
People of the State of Michigan, Plaintiff-Appellee,
v.
Ervin Dewain Mitchell, Defendant, and
Detroit Free Press, Inc., Appellant.
Docket No. 195970.
Court of Appeals of Michigan.
Submitted June 2, 1998, at Detroit.
Decided February 2, 1999, at 9:05 a.m.
Released for Publication April 21, 1999.
Honigman Miller Schwartz and Cohn (by Herschel P. Fink), Detroit, for Detroit Free Press, Inc.
Hamilton, McDonald & Simpson (by Stefani A. Carter), Ann Arbor, for Washtenaw County, Washtenaw County Prosecuting Attorney, *799 and Washtenaw County Public Defender.
Before: MARKMAN, P.J., and SAAD and HOEKSTRA, JJ.
SAAD, J.
Appellant the Detroit Free Press appeals by leave granted an order denying its motion for release of jurors' names and addresses in the trial of Ervin Dewain Mitchell. We remand to the trial court for additional findings in support of its order.

I

NATURE OF THE CASE
The Free Press seeks postverdict access to the names and addresses of jurors who served in a lengthy, high profile, serial rape and murder trial that was open to the press and the public. The trial court denied the Free Press' request to release the names and addresses, in part because the jurors expressed concerns for their safety and also because the jurors said they wished to be left alone. The Free Press' assertion of a constitutional right of access to this information raises an issue of first impression under Michigan law, and one that has yet to be definitively decided by the United States Supreme Court. Most federal and state courts that have addressed this issue have articulated a limited or qualified right to such access, premised on the Press-Enterprise[1] rationale that openness in all aspects of our justice system promotes fairness to litigants and promotes public faith in our jurisprudence. Indeed, such openness has traditionally been the hallmark of the Anglo-American system of justice, serving as an indispensable guarantee against a closed system's potential for arbitrariness and corruption. At the same time, these courts have recognized the need to protect the integrity of our justice system by assuring the jurors' rights to safety and privacy, the accused's Sixth Amendment right to a fair trial, and the trial court's discretion in administering the courtroom. Inadequate attention to these interests could also compromise the integrity of our justice system. This is especially true where the trial court finds that juror safety concerns are legitimate.
In balancing the strong public policy of openness against the policy of protecting the integrity of the jury system by safeguarding jurors' legitimate interests, we hold that the press has a qualified right of access to names and addresses of jurors postverdict. We qualify this right of access by also holding that trial courts have discretion to impose appropriate restrictions on the manner and time of disclosure, and in some circumstances, perhaps, to refuse disclosure, in order to accommodate all the interests of justice, where safety concerns of jurors are found to be legitimate concerns.

II

FACTS AND PROCEEDINGS
This appeal arises from the jury trial of Ervin Dewain Mitchell on consolidated charges of felony murder[2] and three counts of first-degree criminal sexual conduct[3] (CSC-1).[4] Between September 1992 and May 1994, an unknown assailant viciously beat and raped four Ann Arbor women. One died from the beating. The media widely reported these crimes, referring to the unknown assailant as the "Ann Arbor serial rapist." The rapist remained at large until December 1994, when Mitchell was arrested following a fifth attack (not charged in this trial). DNA evidence tied Mitchell to the four previous crimes.
A two-week trial took place in May and June 1995. The trial court commented that the trial was "the most highly publicized case *800 this County has had in decades."[5] Because of the high profile nature of the case, the trial court took measures to protect the jurors' identities. Jurors were identified only by number, not by name, during the pretrial proceeding to eliminate prospective jurors on the basis of questionnaires, and during the voir dire. Jurors were sequestered during the trial. The court prohibited the media from showing the jurors' faces and barred the broadcast media from voir dire. During the trial, the court prohibited "any person from disseminating to the public the names or addresses of the jurors or prospective jurors" and declared that "any attempt by anyone to communicate with a member of the jury panel is subject to criminal contempt of court." Both the Free Press and the prosecutor have averred, however, that the names of the selected jurors were read in open court, a fact we are unable to verify from our review of the record.
Before the jury reached a verdict, the Free Press petitioned the trial court to release the jurors' names and addresses postverdict. The trial court informed the jurors of the request and asked their opinions. The majority of the jurors opposed the request, stating concerns about family privacy or safety. One asked whether defendant Mitchell's family members were violent. Only five out of sixteen jurors (including four alternates) had no objection.
At the June 16, 1995, hearing on the Free Press' request, the trial court summarized the results of the juror interviews and read the following statement from the jurors:
We worked hard to reach this verdict. It was the right thing to do. It was hard on everyone, including all the families involved. We shed a lot of tears. All of our lives have been disrupted, and we've been separated ... from our families for over two weeks. Please respect our privacy and do not attempt to contact us. Thank you for your consideration.
The court also commented on the burdens the jurors shouldered during trial:
These jurors did everything we asked, and demanded, of them for almost three weeks. They returned a considered verdict in a five [sic] count murder/rape trial that included days of testimony that was both violently brutal and scientifically complex. They have served their community well. These "citizen-soldiers" have done their duty and have been discharged. Those who wish to discuss their service with the media are free to volunteer to do so. This Court will not order this jury to be subjected to further intrusions into their private lives.
The requests for publication of juror names and addresses are denied.
Finally, the Court scheduled a postverdict news conference for jurors to attend at their option, but none chose to do so. The Free Press now appeals.

III

PRECISE ISSUE BEFORE THIS COURT
Before beginning our analysis, we will first clarify the exact scope of the issue before us. This is not a case in which juror identities were concealed from the parties; both prosecution and defense counsel were able to review juror questionnaires pursuant to MCR 2.510. This also is not a case in which the media was barred from the courtroom, or denied a transcript of the proceedings, or prohibited from interviewing jurors. Similarly, the jurors were not prohibited from speaking with the press. The Free Press has not contended that it was excluded from attending any portion of this trial or related proceedings. The sole issue we decide is whether the trial court was required, under the media's First Amendment right to news gathering, to provide the Free Press, postverdict, with the names and addresses of jurors.

IV

ANALYSIS

A. Survey of Case Law
In United States v. Gurney, 558 F.2d 1202 (C.A.5, 1977), the Fifth Circuit Court of Appeals *801 held that there was no constitutional violation in the trial court's refusal to release the names and addresses of jurors. In the 1980s, however, the United States Supreme Court held in Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 511, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (Press-Enterprise I), and Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (Press-Enterprise II) (discussed later in this opinion), that the First Amendment gives the media a qualified right of access to courtroom procedures where the particular procedure has been traditionally open to the public and where openness of the procedure logically serves the interests of justice (the "experience/logic" test). This right of media access is qualified and may be restricted where particular circumstances indicate that justice is better served by closure than by disclosure. At issue here is whether the Press-Enterprise I and II right to access to proceedings includes a qualified right of access to jurors' names and addresses.
As the following discussion reveals, there is no clear answer to this question. Federal and state case law provides very little guidance on applying the Press-Enterprise test to this question. Michigan statutory law and case law provide no answer. Though Michigan has a statute relating to the sealing of jury lists, there is no guidance on how and when it may be applied. MCL 600.1321(1); MSA 27A.1321(1) provides (emphasis supplied):
The names of those persons on the first jury list whom the board accepts as persons qualified for and not exempt from jury service shall be compiled into a list or card index to be known as the second jury list. The board shall write the names and addresses of the persons thus selected, and whether or not the records of the board show them to be freeholders, on separate slips of paper of the same size and appearance as nearly as may be. The board shall fold up each slip of paper in the same manner so as to conceal the name thereon and shall deposit it at the times herein provided, in a box, to be called and labeled the board box. The form and construction of the board box shall be approved by the chairman or president, and may from time to time be changed with his approval. Immediately after preparing the slips the board shall seal the second jury list. The list shall remain sealed until otherwise ordered by the presiding circuit judge.[6]
It is also unclear if this provision can also be applied to the list of persons who actually serve as jurors in a trial.[7] Furthermore, if this statute were interpreted as giving the trial court the absolute right to withhold the names of jurors from the media, there would remain the question whether this interpretation is contrary to the First Amendment.

1. The Right of the Media to Attend Court Proceedings
The United States Supreme Court held in Branzburg v. Hayes, 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), that news gathering is protected by the First Amendment of the federal constitution, U.S. Const, Am I. Consistent with this principle, constitutional jurisprudence has developed a tradition of protecting the integrity of the legal process by opening many courtroom proceedings to the press and the public. This includes proceedings relating to juries. In Press-Enterprise I, supra, the United States Supreme Court held that the public's constitutional right of access includes a right to attend the jury selection process in criminal trials. In reaching this decision, two considerations were paramount: first, the lengthy history (dating back to pre-Norman England) of public access to jury selection proceedings; second, the interplay between openness of proceedings and a fair system of justice. The Court stated:
For present purposes, how we allocate the "right" to openness as between the *802 accused and the public, or whether we view it as a component inherent in the system benefiting both, is not crucial. No right ranks higher than the right of the accused to a fair trial. But the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the voir dire which promotes fairness.
The open trial thus plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system. Richmond Newspapers Inc. v. Virginia, 448 U.S. 555, 569-571, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). [Press-Enterprise I, supra at 508, 104 S.Ct. 819 (emphasis in original).]
Although the Court recognized the right to attend the jury selection process, it nonetheless recognized the jurors' competing interest in privacy:
The jury selection process may, in some circumstances, give rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that person has legitimate reasons for keeping out of the public domain.... The privacy interests of such a prospective juror must be balanced against the historic values we have discussed and the need for openness of the process.
To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge in camera but with counsel present and on the record. [Id. at 511-512, 104 S.Ct. 819.]
Thus, although the Supreme Court upheld the right of public and media access to jury selection, it balanced that right against the jurors' privacy rights. It opined on how the trial court's actions failed to properly balance these rights:
Assuming that some jurors had protectible privacy interests in some of their answers, the trial judge provided no explanation why his broad order denying access to information at the voir dire was not limited to information that was actually sensitive and deserving of privacy protection. Nor did he consider whether he could disclose the substance of the sensitive answers while preserving the anonymity of the jurors involved.
Thus not only was there a failure to articulate findings with the requisite specificity but there was also a failure to consider alternatives to closure and to total suppression of the transcript. The trial judge should seal only such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected. [Id. at 513, 104 S.Ct. 819.]
See also United States v. Peters, 754 F.2d 753, 758-763 (C.A.7, 1985) (upholding right of press to attend voir dire absent findings that this was contrary to interests of justice). But see United States v. King, 140 F.3d 76 (C.A.2, 1998) (trial court's decision to close voir dire in high profile trial appropriate under Press-Enterprise I standards).
In Press-Enterprise II, supra at 1, 106 S.Ct. 2735, the Court held that the First Amendment right of public access extended with equal force to preliminary hearings in a California state court, even when the criminal defendant moved for a closed preliminary examination. Again, the Court considered "whether the place and process have historically been open to the press and general public" and whether "the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question." Id. at 8, 106 S.Ct. 2735. The Court concluded that both of these interests favored opening the *803 preliminary examination to the public. The Court noted, however, that this was a qualified right, which might be appropriately limited to serve the interests of justice. Id. at 14-15, 106 S.Ct. 2735.
Our Court applied the Press-Enterprise balancing test in In re Closure of Jury Voir Dire, 204 Mich.App. 592, 516 N.W.2d 514 (1994). We held that limited courtroom space did not justify a trial court's decision to bar the public and press from jury voir dire because the trial court could have accommodated at least a few members of the press and public in the courtroom. Id. at 595-596, 516 N.W.2d 514.

2. The Media's Right to Posttrial Interviews with Jurors
Following this line of authority, other courts have overturned court orders that prohibit or regulate postverdict communications between jurors and the media. For example, in Journal Publishing Co. v. Mechem, 801 F.2d 1233 (C.A.10, 1986), following a civil rights trial against municipal officers, the trial court issued an order prohibiting press interviews with certain jurors. Id. at 1235. Subsequently, a news agency petitioned the federal appeals court for a writ of mandamus ordering the trial court to dissolve this order. Id. Analyzing the issue, the Tenth Circuit Court of Appeals stated that "while a court may broadly proscribe attorney and party contact with former jurors, it does not have the same freedom to restrict press interviews with former jurors." Id. at 1236 (emphasis added). The court held:
A court may impose a prior restraint on the gathering of news about one of its trials only if the restraint is necessitated by a compelling governmental interest. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 606-07, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (dealing with criminal trials); Haeberle v. Texas International Airlines, 739 F.2d 1019, 1021 (C.A.5, 1984); [In re] Express-News [Corp.] 695 F.2d [807] at 810 [CA 5, 1982]; [United States v] Sherman, 581 F.2d [1358] at 1361 [CA 9, 1978]. Moreover, the court must narrowly tailor any prior restraint and must consider any reasonable alternatives to that restraint which have a lesser impact on first amendment rights. Globe Newspaper Co., 457 U.S. at 607, 102 S.Ct. at 2620; Levine v. United States District Court, 764 F.2d 590, 595 (C.A.9, 1985); Express-News, 695 F.2d at 810; Sherman, 581 F.2d at 1361. [Journal Publishing, supra, at 1236.]
The court concluded that the prohibition was unconstitutional because it was overbroad:
It contained no time or scope limitations and encompassed every possible juror interview situation. It would have been constitutionally permissible for the court routinely to instruct jurors that they may refuse interviews and seek the aid of the court if interviewers persist after they express a reluctance to speak. [United States v] Harrelson, 713 F.2d [1114] at 1117-18 [CA 5, 1983]. It could have told the jurors not to discuss the specific votes and opinions of noninterviewed jurors in order to encourage free deliberation in the jury room. Id. at 1118. But the court could not issue a sweeping restraint forbidding all contact between the press and former jurors without a compelling reason. [Journal Publishing, supra at 1236-1237.]
Similarly, in United States v. Sherman, 581 F.2d 1358 (C.A.9, 1978), the court issued a writ of mandamus against a trial court that forbade jurors from discussing the case with anyone and ordered everyone, including the news media, to stay away from the jurors. Id. at 1360. The purported justifications for this order were "to enable the jurors to serve on future jury panels and to protect the jurors from harassment." Id. at 1361. The appellate court determined that the trial court's order was overbroad for these purposes:
Less restrictive alternatives are clearly available for each of these claimed threats. If a juror's impartiality were to be questioned because the juror has spoken to the media that could be discovered on future voir dire and the juror excused. The district court could, in the alternative, excuse all of these jurors from further service. We stress that the inability to serve on future juries is not such a serious nor an imminent threat to justify this restraint and that alternatives are easily available.

*804 In regard to protecting the jurors from harassment, we also fail to see a clear and present danger. The jurors individually, perhaps, may not regard media interviews as harassing. If harassment should occur, the court might properly then act to correct the actual intrusion suffered, but this order is too broad. [Id. at 1361.]
The appellate court issued the writ of mandamus. Id. at 1362.
Also, in In re The Express-News Corporation, 695 F.2d 807 (C.A.5, 1982), the court held unconstitutional a court rule that forbade any person to interview any juror regarding jury deliberations and the verdict without the court's leave. Id. at 808. The appellate court stated that a rule could not "restrict the journalistic right to gather news unless it is narrowly tailored to prevent a substantial threat to the administration of justice." Id. at 810. The court stated that "[a]bsent good cause for restraint, petit jurors are free to discuss their service if they choose to do so," but clarified its position with the statement that it did "not intimate that jurors have any obligation whatever to talk to the news media or to anyone else about their service." Id. at 810-811.
However, in Haeberle v. Texas Int'l Airlines, 739 F.2d 1019 (C.A.5, 1984), the court rejected a claim that a local rule forbidding attorneys to interview jurors without the court's permission was unconstitutional. The court held that the attorneys, unlike journalists "did not seek juror interviews in order to serve the general public's right to receive information about judicial proceedings" but instead "sought information to satisfy their own curiosity and to improve their techniques of advocacy." Id. at 1021-1022. The court concluded that the restriction on this access "carrie[d] far less weight in the first amendment scale than a restriction on access to information that affects political behavior." Id. at 1022.
Though the foregoing cases do not answer the precise issue before us, they do provide important historical and constitutional background to understand better those cases that do address our precise issue. The trial court here has not restricted press-juror communications. Again, the nature of the Free Press' argument is that the Free Press should have access to the jurors' names and addresses, presumably to facilitate its efforts to interview jurors. We are unable to infer from Express News, Sherman, and Journal Publishing whether the Press-Enterprise line of authority extends to a media right to juror identities and addresses.
We therefore turn to cases that, though not binding on this Court, are instructive because they more specifically address the issue at hand.

3. The Right of Media Access to Jurors' Identities
The Free Press relies primarily on United States v. Antar, 38 F.3d 1348 (C.A.3, 1994), and In re Globe Newspaper Co., 920 F.2d 88 (C.A.1, 1990). In Antar, the trial court, in a high profile white collar crime trial, sought to protect the jurors' identities by sealing the jury voir dire transcript. Six months after the completion of the trial, the court ordered the records unsealed, but ordered journalists to cease all questioning of jurors once they expressed a desire to conclude an interview. Id. at 1354-1355. Two news agencies appealed this order. Interestingly, the trial court attempted to justify these restrictions by stating that its purpose was to protect juror identities. The appeals court rejected this argument:
By recasting the question posed as "whether the press has a right of access to the jurors' identities," the court obscured the central issue in this case: the propriety of limiting the right of access sua sponte, without findings, and under the circumstances which existed both at the time of the sealing and at the time of the restricted unsealing.
Although the actions of the district judge served to deprive the press of the jurors' identities, this objective was accomplished by means of sealing the voir dire transcript. Under the Supreme Court's First Amendment analysis, we must look objectively to that which was done and the means by which it was accomplished. [Id. at 1357.]
The appeals court then held that the Press-Enterprise I right of access to jury voir dire *805 encompassed the right to obtain transcripts. Id. at 1360-1362. It concluded that the trial court acted unconstitutionally when it sealed the record without making "the particularized findings which may sufficiently justify a limitation upon the right of access." Id. at 1363. The court also concluded that the restrictions on interviewing jurors were not justified. Id. at 1364.
The application of Antar here is problematic. Contrary to the Free Press' argument, the Antar court did not actually hold that the press has a right to obtain jurors' names. It held only that the media had a right of access to the voir dire transcripta holding that is merely a corollary to the holding in Press-Enterprise I. Indeed, the court's statement, quoted above, that the real issue was not the disclosure of the jurors' identities, but instead the sealing of the voir dire transcript, suggests that the court did not regard mere withholding of the jurors' names as subject to the Press-Enterprise analysis. In fact, the statement strongly implies that protecting jurors' identities may be acceptable if the trial court is able to do so without infringing constitutionally protected aspects of press access. Under these circumstances, we cannot read Antar as mandating disclosure of jurors' names and addresses, absent special circumstances.
The Free Press also relies on Globe, supra. A newspaper petitioned the First Circuit Court of Appeals for a writ of mandamus in response to the Massachusetts District Court's refusal to supply the paper with the names and addresses of jurors. The First Circuit Court of Appeals held that the district court was required to release the information "unless the presiding judge identifies specific, valid reasons necessitating confidentiality in the particular case." Id. at 91. The court's reasoning was based on its interpretation of the interplay between the federal Jury Selection and Service Act of 1968, 28 USC 1861 et seq., and the District of Massachusetts Plan for Random Selection of Jurors, § 10(c). The court interpreted the federal statute as "suggesting that a local plan might optionally decline to permit juror names to be made public at all," and listed Michigan as a state that has exercised this option. Id. at 92, n. 5. The court held that because Massachusetts chose to allow juror names to be made public, the district court could not conceal the names without satisfying an "interests of justice" standard. Id. at 92-93. The court specifically stated that it "need not interpret the statutory and constitutional consequences had the jury plan in question been otherwise." Id. at 92.
Given the legal context of the Globe decision, we do not find it helpful in resolving the issue presented to us. Interpretation of the federal statute is not at issue here. Globe never reached the issue that is paramount in the present case: whether a court rule or order concealing jurors' names is constitutionally permissible.
Defendant also relies on In re Baltimore Sun Co., 841 F.2d 74 (C.A.4, 1988). There, the court held that under the Press-Enterprise cases, the trial court was required to grant the press' request for a list of jurors and venirepersons. Id. at 76. The court declined to follow Gurney, supra, because it believed it to be contrary to the Press-Enterprise cases. The court also rejected the argument that the press could have learned the names of the jurors:
While it may well be true, and probably is, that the Sun was not diligent in its duty to get the names of the people on the venire list in the voir dire proceedings in this case which were open to the public, that does not serve as a reason not to place on the public record, contemporaneously with the trial, the names and addresses of those jurors who are the judges of the facts in the case as well as those from whom the seated jurors were chosen. [Id. at 76.]
The court declined to order the release of any information other than the names and addresses of jurors and veniremen. Id. at 75.
Baltimore Sun is problematic mainly because it relies on the Press-Enterprise cases without fully analyzing the issue. Other than mentioning that in the early days of the jury system "everybody knew everybody on the jury," and the need for openness to maintain public confidence in the system, it does not fully analyze the experience/logic test set *806 forth in Press-Enterprise I. Furthermore, the court expressly stated that its decision was not based on the First Amendment, raising the question of how a decision could be based on the Press-Enterprise cases without implicating First Amendment concerns.
The Free Press also relies on Sullivan v. Nat'l Football League, 839 F.Supp. 6 (D.Mass., 1993), aff'd. 25 F.3d 43 (C.A.1, 1994), In re Indianapolis Newspapers, Inc., 837 F.Supp. 956 (S.D.Ind., 1992), and United States v. Doherty, 675 F.Supp. 719 (D.Mass., 1987), aff'd. in part and rev'd in part 867 F.2d 47 (C.A.1, 1989). All of these cases resolved the issue of disclosing jurors' names to the media by holding that the court was obligated to release the jurors' names and addresses, but allowing a brief period (seven to ten days) before the release.
In Sullivan, the district court expressed its personal opinion that it should not release the jurors' names and addresses, but held that it was obligated to do so under Globe. The court imposed a ten-day waiting period, however, to accommodate the jurors' interest in privacy. Sullivan, supra at 7. The court decided that it would "accommodate the interests present here so as to promote the values espoused by the First Amendment, while protecting the general interests of each of the litigants to a fair trial and, at the same time, minimizing the invasion of the legitimate expectations of privacy of a jury" by "lifting the limited access order to reveal the juror's [sic] names and addresses ten days after the verdict has been returned." Id. The court noted that "[t]he values to be promoted by press access to the names and addresses of the jurors are no less advanced ten days after the return of the verdict." Id. The court's order further directed that "[s]hould a juror indicate that he or she does not wish to be interviewed, no further inquiry or attempt to seek an interview from that juror will be permitted by any news-gathering agency." Id.
The Indianapolis Newspapers court did not fully analyze the issue under the Press-Enterprise cases, but held, in a conclusory fashion, that the values of open court proceedings and jury privacy could be balanced by releasing the jurors' names and addresses one week after the verdict. Indianapolis Newspapers, supra at 958. The court actually published this information in its opinion, and ordered the court clerk to contact the jurors by telephone to inform them that they were free to refuse interviews with the press. Id.
In Doherty, the trial court elaborated on the Press-Enterprise I and II analysis. Evaluating "our American tradition concerning accessibility of the jurors to the press for post-verdict interviews," it concluded that although juror deliberations are unquestionably private, "the broad latitude afforded the press in gathering news, especially in recent years, tends to favor accessibility in this area as well." Doherty, supra at 722. However, the court based this conclusion on cases dealing with restrictions on juror interviews. Id. at 722, n. 3. Regarding the logic test, the court concluded that juror interviews could provide valuable information to the public on the conduct of jury trials. Id. at 723. As for the jurors' concerns about privacy (the jurors unanimously objected to the release of their names and addresses), the court concluded that the court's power to prevent juror harassment ameliorated this concern. Id. at 724. The court held that a seven-day lapse between verdict and the release of juror names would accommodate the jurors' interest in privacy.
In sum, while the Free Press has cited numerous cases that seem to support its position, none of these cases provides clear cut authority for its position. Reading Antar carefully, we find that the court implied that a trial court has the authority to seal jurors' names from disclosure to the media. The outcome of Globe was predicated almost entirely on a federal statute that has no bearing on the present case. Baltimore Sun supports the Free Press' position but, for the reasons stated above, its analysis is not persuasive. Sullivan, Indianapolis Newspapers, and Doherty resolved the issue by imposing a brief moratorium on the release of jurors' names. Although this may address privacy concerns, we are unable to see how a week-long waiting period would satisfy concerns for jurors' safety.
*807 However, if the Free Press' cited authority does not satisfactorily resolve this issue, the same is true of the authority cited by the prosecutor.
The prosecutor relies on United States v. Edwards, 823 F.2d 111 (C.A.5, 1987). In Edwards, the trial court held two in camera hearings to investigate allegations of juror misconduct. Id. at 113. The court sealed transcripts of these hearings. After the trial ended in an acquittal, the Times-Picayune moved for release of the sealed records. The trial court unsealed the transcripts, but redacted names of jurors and certain comments that were irrelevant or embarrassing to jurors. Id. at 114. The Times-Picayune appealed, claiming that the redactions were unconstitutional.
The Fifth Circuit Court of Appeals reviewed the Press-Enterprise cases and concluded that no First Amendment right of access attached to the jurors' names. Id. at 115-116. The court noted that the Press-Enterprise I case "instructed that redaction of juror names or portions of the transcript may constitute a reasonable alternative to safeguard jurors from unwarranted embarrassment and yet preserve the competing interests served by disclosure." Id. at 120. The Edwards court rejected the Times-Picayune argument that the Press-Enterprise I court was concerned with jurors' disclosure of embarrassing personal facts, as opposed to the "minor discomfort" of the Edwards jurors who testified about juror misconduct. The Fifth Circuit Court of Appeals rejected this distinction:
The usefulness of releasing jurors' names appears to us highly questionable. The transcripts will reveal the substance and significance of the issues. Had the jury deliberations resulted in conviction, the issue of juror bias would inevitably have been appealed, with the unexpurgated transcript available as a matter of record. Had the government seriously suspected that a particular juror had been compromised, and had those suspicions been substantiated, collateral proceedings subject to the full gamut of first amendment challenges would follow. In [United States v] Gurney, 558 F.2d 1202 (C.A.5, 1977), we held that the trial judge's refusal to release the names and addresses of jurors violated no first amendment right of access. Our Court has recognized that, although post-trial restrictions on news gathering must be narrowly tailored, the jurors are entitled to privacy and protection from harassment even after completing their duties. [Id. at 120.]
The court commented that "although posttrial restrictions on news gathering must be narrowly tailored, the jurors are entitled to privacy and protection from harassment even after completing their duties." Id. at 120. But see United States v. Simone, 14 F.3d 833, 840 (C.A.3, 1994) (press has First Amendment right to attend posttrial hearing on jury misconduct).
While Edwards is more relevant to the instant case than was Antar, it is nonetheless distinguishable. Edwards did not expressly hold that there is no right of access to jurors' names under Press-Enterprise I. Rather, it appears that the Edwards court approved redaction of the jurors' names only because they could be embarrassed by accusations of misconduct. It could be inferred from Edwards that the redaction would not have been permitted otherwise.
The prosecutor also relies on Gannett Co., Inc. v. Delaware, 571 A.2d 735 (Del.1989). The Delaware Supreme Court applied the Press-Enterprise experience/logic test and concluded that there is no First Amendment qualified right of media access to jurors' names. Id. at 743. The court found no significant tradition of announcing jurors' names in the court ("Merely because an historic procedure exists, does not automatically enlarge it to constitutional proportions.") Id. at 745. It emphasized the statutory discretion that many state courts have over the release of jurors' names. Id. As for the logic prong of the Press-Enterprise cases, the Gannett court concluded that release of jurors' names would not serve the interests of justice any further than existing jury procedures. Id. at 749. Gannett also relied heavily on the principle that a trial court has discretion over courtroom proceedings and has an obligation to prevent outside influences on juries. Id. at 742, 746. *808 Gannett applies a more thoughtful analysis of the Press-Enterprise test than any of the other cited decisions. One problem, however, is that the court was substantially influenced by Gannett's egregious conduct in a previous trial. In that trial, Gannett published the names of unsequestered jurors while the trial was still in progress, contrary to a court order to keep the names confidential. Id. at 738. Furthermore, we believe that the Gannett court did not adequately consider how media access to jurors' names advances the policy of open judicial proceedings.

B. Application of Case Law to Present Case
In one sense, the Free Press' request for juror names and addresses appears to be much like other media efforts to obtain access to a judicial proceeding, and therefore subject to the Press-Enterprise I and Press-Enterprise II analysis. In another sense, however, the Free Press' request is markedly distinct. The Free Press is, in effect, requesting the trial court to facilitate its coverage of the trial by assisting its efforts to question jurors. Furthermore, the likely reason the Free Press wants this information relates to jury room deliberations and jurors' reactions to and opinions of the evidence information that is rarely revealed in conjunction with courtroom proceedings. With these considerations in mind, we assign the Free Press' request its proper place in the panoply of the media's First Amendment rights to news gathering.
We read Press-Enterprise I and II, with their emphasis on the openness of legal proceedings, as providing the press with a qualified right of access to the identity of jurors. Were this not so, in an extreme case, a court could, with unlimited discretion, totally conceal the identity of jurors and thus create the impression of a secret process that Press-Enterprise I and II caution against. This would seriously undermine the openness that has traditionally been the hallmark of our system of justice. We therefore decline to follow strictly the ruling in Gannett, supra. On the other hand, we do not believe that availability of jurors' names is as critical to maintaining an open process as were the procedures implicated in the Press-Enterprise cases and their progeny. Accordingly, we afford the trial court wider leverage in responding to media's requests for the names and addresses of jurors than we would in other circumstances.
Furthermore, while we recognize that media access to jurors' names advances the cause of confidence in our system of justice by maintaining openness of judicial proceedings, we also recognize that unlimited access could undermine our justice system. Uninhibited and frank jury deliberations are essential to our system of justice. That frankness would be jeopardized if jurors refrained from speaking freely because they fear for their safety should their names and comments become public knowledge. To ensure conscientious and thorough deliberations, trial courts need some discretion to ameliorate jurors' legitimate fears by imposing suitable restrictions on media access to jurors' names and addresses. By allowing the trial court this discretion, we further protect the integrity of the jury system by building public confidence that the courts will shield jurors from danger and abuse. Therefore, to accommodate all interests of justice, we hold that the trial court retains the discretion to formulate restrictions on the time and manner of disclosure of jurors' names or, in some cases, perhaps, deny disclosure, providing that the trial court's order is appropriately tailored to the particular circumstances.[8]
In restricting media access to jurors' names and addresses, our greatest concern, of course, is juror safety. In the vast majority of trials, there are no safety implications for jurors and the media has no interest in reporting the names or comments of jurors. Therefore, as a practical matter, there is rarely a realistic threat to juror safety arising from media access to jurors' names. We are concerned, however, with the exceptional cases, especially organized crime trials, and trials involving an unusually violent offender, such as a serial rapist/murderer. These are the cases most likely to draw media attention and to involve a risk or at least a fear of violent retaliation for an unwelcome verdict.
*809 We are not satisfied that any of the cited authorities adequately addresses juror safety concerns. We disagree with the Antar court's requirement that the trial court make "particularized findings" that jurors would be endangered if their names were released before restricting media access to the names. Antar, supra at 1364. Only rarely will a trial court have concrete evidence of a potential risk of harm to a juror. We also doubt that the brief moratorium allowed by Sullivan, Indianapolis Newspapers, and Doherty would have any efficacy in protecting jurors from violent retaliation. We believe jurors' own expressions of safety concerns are entitled to serious consideration by the trial court. On the other hand, the media's right of access would be unduly and unreasonably limited if the trial court could refuse to disclose jurors' names merely because jurors subjectively feared harassment without any realistic basis. We therefore hold that the trial court cannot deny media access to jurors' names and addresses without first making a determination that concerns for jurors' safety are legitimate and reasonable. The trial court's findings of safety concerns and articulation of the reasons will also allow for appropriate appellate review.
To a lesser extent, we recognize jurors' interest in their privacy. Privacy concerns alone, unaccompanied by safety concerns, are not sufficient to justify total denial of media access to jurors' names. To use the trial court's phrase, jurors are "citizen-soldiers" charged with carrying out an important public responsibility. As with any other public officers, jurors sometimes must bear certain irritations in carrying out their duties. However, privacy concerns may justify a lesser restriction, such as a brief waiting period or an order prohibiting reporters from repeatedly attempting to question jurors who have already refused an interview.
We therefore hold that the press has a qualified right of postverdict access to juror names and addresses, subject to the trial court's discretion to fashion an order that takes into account the competing interest of juror safety and any other interests that may be implicated by the court's order.[9] Here, we cannot determine from the record before us if the trial court made specific determinations regarding the jurors' expressions of concern for their safety. Accordingly, we remand to the trial court for specific findings regarding juror safety consistent with this opinion. Remanded for specific findings regarding juror safety. We retain jurisdiction.
NOTES
[1] Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 511, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (Press-Enterprise I) and Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (Press-Enterprise II).
[2] MCL 750.316; MSA 28.548.
[3] MCL 750.520b; MSA 28.788(2).
[4] Mitchell unsuccessfully appealed his convictions and sentence. People v. Mitchell, unpublished opinion per curiam of the Court of Appeals, issued July 31, 1998 (Docket No. 188718).
[5] Mitchell unsuccessfully moved for change of venue because of the extensive pretrial publicity. We affirmed the trial court's denial of that motion. People v. Mitchell, supra, n. 4.
[6] Under Washtenaw Circuit Court policy, the list of all persons called for jury duty during each two-month term (approximately 2,000) is a public document. The juror list for each trial, however, is not available to the public.
[7] In In re Globe Newspaper Co., 920 F.2d 88, 92, n. 5 (C.A.1, 1990), the First Circuit Court of Appeals cited this statute to show that Michigan is one of a number of states that grant a trial court discretion to conceal or release the names of jurors.
[8] The trial court's attempt to accommodate the Free Press by scheduling a press conference and inviting jurors to attend is an example of a reasonable compromise trial courts can employ once it has been determined that jurors' names should be sealed to protect their safety.
[9] For example, a trial court might act to protect juror privacy by precluding jurors from revealing the statements other jurors made during deliberation. See United States v. Cleveland, 128 F.3d 267 (C.A.5, 1997), and Journal Publishing Co. v. Mechem, 801 F.2d 1233 (C.A.10, 1986). See also Antar, supra at 1364 (prohibition against jurors disclosing votes of other jurors may be appropriate in specific cases, provided that trial court articulates findings in support of the restriction), and Doherty, supra at 723 ("For one juror to make public the thoughts and deliberations of his or her colleagues in the deliberation room will `chill' the free flowing process that our system encourages"). Such safeguards protect the integrity of the jury system by building jurors' confidence that their comments during deliberation will not become public knowledge without the juror's consent.