**UNITED STATES of America,**

v.

**Joseph L. BRUNO, Defendant.**

**No. 1:09–CR–29 (GLS).**

United States District Court,
N.D. New York.

Feb. 24, 2010.

Richard S. Hartunian, Elizabeth C. Coombe, United States Attorney, William C. Pericak, Assistant U.S. Attorneys, James T. Foley, U.S. Courthouse, Albany, NY, for The United States.

Abbe D. Lowell, Esq., McDermott, Will Law Firm, Washington, DC, William J. Dreyer, Esq., Dreyer, Boyajian Law Firm, Albany, NY, for The Defendant.

Jonathan Donnellan, Esq., Ravi Sitwala, Esq., The Hearst Corporation, Office of General Counsel, New York, NY, for The Intervenor.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, District Judge.

### I. *Introduction*

Asserting the public's constitutional right of access, the Hearst Corporation (hereinafter Times Union) seeks to intervene and moves for disclosure of jury information in this high-profile criminal case. (Dkt. No. 185.) The court interprets the motion as seeking disclosure of the identities, addresses, and questionnaires of the twelve regular trial jurors, and an order directing court reporters to file unredacted transcripts of the voir dire. (*See id.*) The government and defendant Joseph L. Bruno opposed disclosure during jury deliberations, but were silent as to their post-trial positions. (*See* Dkt. Nos. 192, 193.)

In light of the court's prior ruling in *United States v. Strevell*, No. 05–CR–477, 2009 WL 577910, at *3 (N.D.N.Y. Mar. 4, 2009), the motion to intervene is granted. And for the reasons that follow, Times Union's motion for disclosure is granted in part and denied in part such that: the court reporters are directed to file unredacted transcripts of the voir dire on the court's official public docket; the request

to disclose juror names is denied as moot because their names were publicly disclosed during voir dire; and the request to disclose home addresses and pretrial questionnaires is denied.

### II. *Background*

Assertions in Times Union's motion suggest a misunderstanding of the underlying record. Accordingly, the court begins with an overview of the facts and law as it relates to jurors.

### A. *The Bruno Prosecution and the Jurors*

Before defendant Joseph L. Bruno's mid–2008 resignation from the New York Legislature, he was the Senate Majority Leader and 43rd District Senator. Six months after his resignation, he was indicted on federal corruption charges. More than two years before his indictment, he became the subject of increasing public and press scrutiny, especially in the Capitol District area, which includes the 43rd District. During that time, in addition to disclosing that he was under investigation by federal authorities, Bruno became embroiled in a feud with former Governor Spitzer, which eventually degenerated into so-called "Troopergate," a scandal in which Spitzer allocated State Police resources to investigate Bruno's official travel. As a result, during the period preceding trial, there was incessant media scrutiny of Bruno's conduct, public disclaimers of wrongdoing by Bruno, and public pronouncements of support for Bruno. Therefore, when the Northern District's random assignment wheel spun in January 2009, this court inherited a controversial prosecution, a statewide media frenzy, and the impending need to empanel an impartial jury.[1]

---

1. Most of the indicted conduct related to Bruno's Albany activities, and neither party

In February 2009, the court held its first pretrial conference in chambers. Over the parties' objections, the court acknowledged the public's right of access and permitted the attendance of Times Union reporter, Brendan Lyons. During that conference, the court publicly scheduled a November trial date, and discussed the anticipated difficulty of empaneling an impartial jury given the media frenzy and the source for prospective jurors, the Albany Division pool.[2] To prevent juror taint, the court ordered strict compliance with the Northern District's Fair Trial–Free Press Guidelines. *See* N.D.N.Y. L.R. 23.1. As to jury selection, the court discussed the use of questionnaires as a means to screen the jury pool and expedite selection. Because Mr. Lyons was present, Times Union was fully cognizant of these rulings. (*See* 02/10/2009 Minute Entry.) On September 1, 2009, the court publicly reaffirmed its decision to use questionnaires, shared samples with the parties, and sought their guidance on specific questions. (*See* 09/01/2009 Text Order, Dkt. No. 50.) After proposals were submitted, the court conducted another public pretrial conference regarding questionnaire content. (*See* Dkt. Nos. 52–53, 55–56; 09/15/2009 Minute Entry.) Although the press chose not to attend, Times Union later obtained a transcript of the proceedings. (*See* Dkt. No. 66.)

In early September, the court ordered a special jury panel, and directed that 500 summonses be mailed to a random group of citizens in the 20,000–member Albany Division pool. (*See* Jury Plan § IV.) Because the pool is drawn from duplicative voter registration and motor vehicle records, both experience and the Jury Plan anticipate less than a 100% response rate. (*See id.*) The court is also legally authorized to pre-screen and excuse potential jurors under appropriate circumstances. Accordingly, as summonses returned, the court issued public orders excusing numerous jurors, resulting in a final pool of approximately 300 jurors.[3]

As a further pre-screening measure, the 300 jurors were ordered to respond to a written questionnaire on October 1, 2009. (*See* Dkt. No. 215.) In accompanying instructions, the court advised the prospective jurors as follows: "[P]lease complete the questionnaire honestly and to the best of your ability. It is important that you answer all questions as completely and candidly as possible. *Please understand that your completed questionnaire is strictly confidential and will not be made public.*" (*See id.* at 1 (emphasis added).) The questionnaire contained fifty-five questions, many asking for personal information such as: prior arrests and criminal history; physical and mental impairments and disabilities; medical conditions and physician treatment schedules; marital status, including divorce and non-marital living arrangements; unemployment; fi-

---

sought a change of venue. *See* FED.R.CRIM.P. 18 (place of trial), 21 (change of venue).

**2.** The Albany Division pool is drawn from the counties of Albany, Columbia, Greene, Rensselaer, Saratoga, Schenectady, Schoharie, Ulster, Warren, and Washington. *See* General Order 24, *Jury Plan for the Random Selection of Grand and Petit Jurors* ("Jury Plan") (N.D.N.Y.2009); *see also* 28 U.S.C. § 1863(a) (requiring a written plan for the random selection of grand and petit jurors).

**3.** *See* 10/01/2009, 10/07/2009, 10/08/2009 Text Orders, Dkt. Nos. 69, 96, 98 ("Pursuant to 28 U.S.C. §§ 1863, 1865, 1866, General Order 24, and authority engrafted on the jury summons, the court will excuse the potential jurors as identified in the accompanying sealed document. The court directs the Clerk of Court, pursuant to the privacy rights of the prospective jurors and as otherwise permitted by law, to publicly file this order and file the attachment....")

nancial investments; activity in political campaigns and organizations, including unions; political affiliations; victimization; and personal views regarding public officials. (*See id.* at 7–27).

The main purpose of the questionnaire was to pre-screen the pool, and excuse jurors who could not serve for various legal reasons. Nonetheless, and because the parties anticipated trial evidence relating to political matters, ethical issues, investments, and organized labor and unions, the questions were also relevant to the parties' assessment of juror qualifications and the need for further questioning during formal voir dire. Obviously, the questions elicited personal disclosures that normally receive privacy guarantees in both the public and private sectors. For these and other reasons, the court promised confidentiality. Once the completed questionnaires were received, they were disseminated to the parties subject to an order precluding further disclosure. The names in the pool were then randomly spun and the first seventy-five jurors were instructed to report on November 2, 2009.

Anticipating intense public and press interest, and because of limited space, the court authorized various advance accommodations. Partial spectator seating was reserved for the press and public, and an anteroom was wired so that the public could see and hear the proceedings. The press was also provided a separate room for electronic communications. The court authorized the public release of trial exhibits. And, the press negotiated "Realtime" coverage with court reporters, thus obtaining simultaneous trial transcripts.[4]

With these arrangements in place, twelve regular jurors were selected and empaneled on the morning of November 2. The court used its routine struck selection method. Each juror's name was publicly announced, and the jurors were seated according to their pre-spun numerical order. The court then asked questions, publicly referring to the jurors by name. When the court exhausted its questions, each party asked questions, publicly referring to the jurors by name. Throughout the selection process, the court employed no measures to preclude identity disclosure. Times Union's suggestion to the contrary is wrong. The public and press were free to hear the names if they listened. Furthermore, Times Union incorrectly states that the court precluded questions about questionnaire content. Obviously unfamiliar with the court's practice, it misunderstood the court's instructions to the parties concerning the scope of their questions. Other than time constraints, the only limitations were relevance and duplication, not questionnaire content.

After three weeks, the proof concluded and the court instructed the jury. (*See* 11/23/2009 Minute Entry, Dkt. No. 173.) After deliberating for seven days, the jury reported a partial verdict on Monday, December 7. (*See* 12/07/2009 Minute Entry, Dkt. No. 194.) The jury failed to reach a verdict on one count, and the court declared a mistrial as to that count. (*See id.*) The possibility of a retrial remains outstanding since the government has yet to announce its intentions.

After the verdict, and because of anticipated media contact, the court met with the jurors and explained their privacy rights. The court told them that they were no longer bound by restrictions on outside contact, and that the decision to speak was strictly a matter of individual choice. Having seen post-trial coverage,

---

4. Realtime permits simultaneous verbatim coverage through computers, subject to court reporter disclaimers concerning transcript accuracy.

the court knows that Times Union identified and contacted jurors. While some elected to speak, others did not.

During the jury's deliberations, Times Union filed the instant motion on Thursday, December 3. (*See* Dkt. No. 185.) Two days later on the day the verdict was returned, the parties responded and Times Union sought an immediate ruling. (*See* Dkt. Nos. 192–93, 198.) Given the volume of other matters then pending and, more importantly, the need for careful consideration of the current issues, the court declined the invitation to rule immediately.

### B. *Juror Policies and Procedures*

Although the court did not preclude juror identification, there are rules adopted by this district and federal courts that have a bearing on disclosure of juror information. Designed to protect the privacy of jurors and others involved in federal litigation, these rules acknowledge the fundamental reality of modern life: personal privacy is a shrinking domain in need of robust safeguards.

Arguably, federal law criminalizes the unauthorized disclosure of juror information. *See* 28 U.S.C. § 1867(f). Because of this statute, as well as concerns for privacy and public confidence in judicial integrity, the United States Judicial Conference, through the Administrative Office of United States Courts, has authored guidance on this subject. Generally, juror information is considered private, and courts are encouraged to protect it. *See, e.g.,* GUIDE TO JUDICIARY POLICIES AND PROCEDURES, Vol. 10, Ch. 3, §§ 310.10, 330.20.[5] Thus, court reporters are directed to redact juror identities from trial transcripts, and judges are asked to preclude public disclosure of jurors' names by using a numeric identifier. *See* Memorandum from James C. Duff to

Chief Judge of the U.S. Dist. Courts: Protecting Privacy Interests in *Voir Dire* Transcripts at 3 (April 22, 2009), *available at* http://jnet.ao.dcn/Memos/2009_Archive/Dir9048.html.

To support this policy, a new federal rule was enacted in 2007 authorizing the redaction of home addresses and other information. *See* FED.R.CRIM.P. 49.1. Northern District rules preclude disclosure of home addresses. *See* N.D.N.Y. L.R. 8.1; N.D.N.Y. General Order 22, § 11.2. In the interests of justice, the court may keep juror names confidential. *See* 28 U.S.C. § 1863(b)(7); Jury Plan § X. Upon written application, juror names may be released to the press *after* trial. *See* Jury Plan § XII(B). Juror questionnaires are court property and subject to privacy restrictions. *See id.* Lastly, juror identities are not to be disclosed in either the public docket or court transcripts. *See id.* Upon written application, the court may order reporters to file unredacted transcripts. *See id.*

As for jury selection, judges are authorized to pre-screen jurors and excuse them for multiple reasons, including: felony convictions or pending felony charges; physical or mental infirmities; citizenship; English comprehension; principal caretaker for aged, infirm, or children; age-under 18 or over 70; traveling distance; jury service within the preceding two years; occupation—active military, volunteer safety personnel, sole business proprietor, or practicing attorney, physician, dentist, clergy, or registered nurse; undue hardship or extreme inconvenience; or inability to render impartial jury service. *See* 28 U.S.C. §§ 1863(5), 1865, 1866(c); Jury Plan, §§ VII–X; *see also United States v. Elliott,* 363 F.Supp.2d 439, 442–43

---

5. The GUIDE TO JUDICIARY POLICIES AND PROCEDURES is available at: http://jnet.ao.dcn/Guide_ New/Vol_10_Public_Access_and_Records/Ch_ 3_Privacy_pdf.html.

(N.D.N.Y.2005) (discussing authority of the Federal Rules, Local Rules, and General Orders in governing criminal procedures). Screening is frequently accomplished through questionnaires filed in advance of selection, information disclosed in summons returns, juror biographical forms completed on the first day of trial, and jurors' answers during selection. When questions in open court call for disclosure of personal details deserving privacy protection, confidential answers are typically provided at sidebar.

### III. *Discussion*

In this age of instant access to all forms of information and the resulting personal security concerns, courts are called upon to balance the privacy rights of citizens constitutionally called to duty as jurors in a criminal case against the right of fellow citizens to invade their privacy under the Constitution and common law. *See* U.S. CONST. art. III, § 2, cl. 3 ("The Trial of all Crimes ... shall be by Jury...."); U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed....").

Times Union implies that the First Amendment permits universal public access to all juror information utilized in the jury selection process. Because the court interprets the selection process as including more than just voir dire, it disagrees. Some information is privately housed in court records and is not publicly disclosed, including juror addresses and other personal and private details used by the court to pre-screen prospective jurors and excuse those with legal cause. Arguably, such information is accessible only through the common law, if at all.

 Regardless of whether the right of access is premised on the First Amendment or common law, the openness of criminal trials has historically been recognized as an indispensable attribute of the Anglo–American legal system. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 569, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (plurality opinion). Thus, "since the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown." *Press–Enterprise Co. v. Superior Court of Cal.,* 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed ... [which] enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Id.* at 508, 104 S.Ct. 819 (citation omitted). Both the First Amendment and the common law recognize openness as the norm.

 Clearly, the First Amendment governs access to voir dire, which is traditionally conducted in open court. So too, it arguably extends to documents used to facilitate voir dire. On the other hand, the common law focuses on judicial documents, not formal proceedings. Judicial documents are publicly accessible if they influence quintessential judicial functions. *See generally Strevell,* 2009 WL 577910, at *3–5. Under either right, access is qualified. Thus, although both presume access, that presumption may be outweighed by privacy concerns that present either higher values (First Amendment) or countervailing factors (common law). *See id.* at *4; *see also Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (right to access criminal trials is qualified); *ABC, Inc. v. Stewart,* 360 F.3d 90, 98 (2d Cir.2004) (same).

■ As to either higher values or countervailing factors, access can be denied to preclude disclosure of sensitive information if it is shown "that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co.*, 457 U.S. at 606–07, 102 S.Ct. 2613; *see also Press–Enterprise Co.*, 464 U.S. at 510, 104 S.Ct. 819. In criminal trials, there are a series of competing, and at times overlapping, interests. The public's access rights and the accused's constitutional right to a public trial converge with the accused's right to trial by an impartial jury. And these competing interests further vie with the jurors' "legitimate privacy interests," compelling interests that protect sensitive information that may endanger, harass, intimidate, or embarrass. *Press–Enterprise Co.*, 464 U.S. at 511–12, 104 S.Ct. 819. Numerous courts have found privacy interests worthy of protection as higher values or countervailing factors. *See Strevell*, 2009 WL 577910, at *4–5 (collecting cases).

■ The interest in protecting jurors' privacy rights strengthens the integrity of our justice system by assuring their rights to safety and privacy and by encouraging the candor of impaneled and prospective jurors and future venire. *See, e.g., United States v. King*, 140 F.3d 76, 79 (2d Cir. 1998). In closing voir dire, the District Court in *King* explained that "[p]rospective jurors, if made aware that their views will be publicly disseminated in the next day's newspapers or radio or television broadcasts, will be under pressure not to express unpopular opinions relevant to their choice as trial jurors." *Id.* (citation omitted); *see also In re Disclosure of Juror Names and Addresses*, 233 Mich.App. 604, 592 N.W.2d 798, 799 (Mich.Ct.App. 1999) (qualifying the right of access based on trial court's "discretion to impose appropriate restrictions on the manner and time of disclosure, and in some circumstances ... to refuse disclosure, in order to accommodate all the interests of justice");[6] *In re S.C. Press Ass'n*, 946 F.2d 1037, 1043 (4th Cir.1991) ("[F]ear of publicity that might be given to answers of venirepersons during voir dire may so inhibit or chill truthful responses that an accused is denied the fair trial to which he is entitled under the [Constitution]."); *United States v. Colabella*, 448 F.2d 1299, 1304 (2d Cir.1971) ("It is too much to expect of human nature that a juror would volunteer in open court, before his fellow jurors, that he would be influenced in his verdict by a newspaper story of the trial.").

■■ In balancing these interests, the court must in its discretion "make a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise" before, during, and after the proceedings. *United States v. Childress*, 58 F.3d 693, 702 (D.C.Cir.1995); *see also United States v. Brown*, 250 F.3d 907, 914–15 (5th Cir.2001) (holding that the trial court may refuse to allow the media to inspect documents that are not a matter of public record and that such refusal does not operate as a prior restraint). The conclusion of the trial does not remove the

---

6. "[U]nlimited access could undermine our justice system. That frankness would be jeopardized if jurors refrained from speaking freely because they fear for their safety should their names and comments become public knowledge. To ensure conscientiousness and thorough deliberations, trial courts need some discretion to ameliorate jurors' legitimate fears by imposing suitable restrictions on media access to jurors' names and addresses. By allowing the trial court this discretion, we further protect the integrity of the jury system by building public confidence that the court will shield jurors from danger and abuse." *In re Disclosure of Juror Names and Addresses*, 592 N.W.2d at 808.

jurors' interest in privacy and protection from harassment. *See United States v. Gurney*, 558 F.2d 1202, 1210 & n. 12 (5th Cir.1977); *see also United States v. Harrelson*, 713 F.2d 1114, 1118 (5th Cir.1983) ("Common sense tells us that a juror who has once indicated a desire to be let alone and to put the matter of his jury service behind him by declining to be interviewed regarding it is unlikely to change his mind; and if he does, he is always free to initiate an interview."); *but see Forum Commc'ns Co. v. Paulson*, 752 N.W.2d 177 (N.D.2008) (finding blanket post-trial closure of questionnaires unwarranted where trial court's articulated reasons—that the court promised confidentiality to jurors and that a defendant in a prior, unrelated case had harassed jurors—insufficient to overcome presumption of public access).

 Additionally, the privacy rights of prospective jurors extends to matters having nothing to do with their formal selection as trial jurors. For instance, under the Federal and Local Rules, addresses are not disclosed to the parties or the public. Instead, generic information is provided, namely, county and city, town, or village of residence. Such information is entirely sufficient to facilitate juror selection. As for privacy and security, the court is mindful that in this technological age, the internet savvy can easily use specific addresses to obtain satellite photographs of any juror's front porch. And, while anecdotes do not control constitutional or common law policy, this district has experienced the harm caused by unwarranted disclosure.[7] Simply put, the parties and the public are entitled to no more than generic addresses. Thus, jurors' rights to security and privacy unquestionably outweigh the media's need for a roadmap to their doorsteps.

 Privacy rights also extend to juror information disclosed for pre-screening purposes. The court routinely solicits sensitive information from potential jurors and uses it to excuse them for legal or discretionary cause. For example, the court would routinely excuse a woman suffering from breast cancer unable to serve because of ongoing chemotherapy treatments, or would disqualify an otherwise reputable citizen because of a foolhardy criminal conviction in his distant past. While the private disclosure of this type of information is a part of the jury selection process, the court cannot conclude that the public's right to access such information outweighs a citizen's privacy rights, especially when that citizen is performing a civic function.[8]

 With these principles in mind, the court turns to the specific relief sought in this case. While district rules and federal policy would have warranted non-disclosure of juror identities before deliberations were concluded, the court publicly announced their names when they were seated and they were then periodically identified during subsequent questioning. The parties had complete and uncompromised access to juror names. Thus, there was no

---

7. In an unrelated case, a pro se civil rights prisoner gained access to a female juror's identity and address during voir dire, and subsequently traumatized her by repeatedly mailing inappropriate letters.

8. Whether disclosed in summons returns, biographical data forms, or pretrial questionnaires, such information is typically contained in what are likely judicial documents that influence a quintessential judicial function (pre-screening), which would therefore be subject to the common law right of access. It is unclear, however, whether pre-screening is a function quintessential to an otherwise public trial. Regardless, the court need not resolve the issue because a juror's right to privacy is a countervailing factor which may rebut the presumption of access.

potential prejudice to Bruno's right to a fair trial. More importantly, the press had full voir dire access to the jurors' names. The press was never barred from the courtroom and were provided with an overflow room with a live video and audio feed of all proceedings. Additionally, jurors were apprized of their right to speak with the press after the verdict was rendered, and several elected to do so. Under these circumstances, the public's right to access was not abridged, and the motion is denied as moot. However, the court directs the court reporters to file unredacted voir dire transcripts. While the reporters have complied with district rules, there is no need for further redaction.

■ As to juror addresses, the district's rules preclude disclosure. In fact, the addresses have never been disclosed to the public or the parties, and they are housed in private judicial records. While those private records arguably constitute judicial documents subject to the common law, the presumption of access is outweighed by each juror's countervailing right to privacy.

■ As to the questionnaires, the motion is also denied. Times Union seeks only First Amendment access, arguing that voir dire was partially conducted behind closed doors. This argument ignores the dual purpose of the questionnaires. First, several questions called for disclosure of sensitive matters that enabled the court to exercise its pre-screening function. While the court obviously did not excuse those who ultimately sat, that does not mean that those jurors did not disclose private aspects of their lives deserving privacy protection. Second, non-pre-screening questions undoubtedly provided the parties information about juror backgrounds in the context of anticipated evidentiary matters. That information was designed to facilitate further voir dire questioning at the parties' discretion, and ultimately the exercise of their peremptory challenges.

To the extent the questionnaires disclosed personal details pertinent to the court's pre-screening function, that information is not traditionally public. To the extent the questionnaires served the secondary purpose of providing the parties with juror information and views that could be impacted by the trial evidence, such information is often public if appropriate questions are openly asked during voir dire. Here, the parties could have asked relevant questions, regardless of questionnaire content. Obviously, the court cannot resurrect the process and certify that the parties would have asked more or different questions in the absence of the questionnaires. Ultimately, and depending on the particular question at issue, public access is subject to mixed First Amendment and common law analysis. In any event, since access is qualified under either right, the ultimate question is whether the jurors' rights to privacy outweigh the presumption of access. Therefore, as far as the pre-screening questions are concerned, the court has already found that public access must give way to juror privacy rights.

■ As to the remainder of the questions, the court concludes that the jurors' rights to privacy represent higher values in the context of this case. Balancing the competing interests, disclosure is contrary to justice. "[The] right to privacy is a legitimate governmental concern, even where a potential juror makes no affirmative request to be interrogated in camera regarding matters of a personal nature . . . [or where] no opportunity to request an in camera proceeding was presented to the venire." *In re Derderian*, M.P. No. 06–835, 2006 WL 2942786, at *6 (R.I.Super. Oct. 12, 2006). The potential that this jury

would become the subject of relentless public scrutiny simply because they honored their constitutional duty is too great a price to be endured. Moreover, while not determinative or controlling, the court expressly promised the jurors that the information they disclosed in the questionnaires would remain confidential until each juror in his or her individual capacity waived that confidentiality. At no point in the questionnaire or during the proceedings did the court indicate that prospective jurors would be subjected to the type of extensive publicity that the selected jurors have been subjected to during trial and after reaching a verdict.

More importantly, however, the nature of the information disclosed in anticipation of the trial evidence deserves protection because it is extraordinarily personal and sensitive. As already noted, disclosures included information about divorce, living arrangements with significant others, unemployment, union activity, personal financial investments, victimization, political activity, and personal views about public officials. Ultimately, the sensational nature of this case and the public attention it has received is readily apparent, as evidenced by, among other things, hundreds of news articles. The nature of the charges and the emotional and political climate surrounding this trial are important factors that the court has considered. It should also be stressed that "[a] trial judge is usually well-aware of the ambience surrounding a criminal trial...." *United States v. Eufrasio*, 935 F.2d 553, 574 (3d Cir.1991). Thus, the court concludes that jurors' privacy rights embody higher values and countervailing factors that preclude disclosure of the questionnaires under either the First Amendment or the common law.[9]

## IV. *Conclusion*

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that:

1. The motion to intervene is **GRANTED**;

2. The motion to disclose juror names is **DENIED** as moot;

3. The motion to disclose juror home addresses and questionnaires is **DENIED**;

4. The court reporters are directed to file unredacted transcripts of the voir dire proceedings; and

5. The Clerk of Court is hereby directed to file under seal the pre-trial questionnaires of the twelve regular jurors, to be unsealed only upon further order of this court or the Second Circuit Court of Appeals; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

---

**9.** In closing, the court makes two additional observations. First, it has considered disclosure of redacted questionnaires, but determined that the pre-screening and privacy protected information is so intertwined that meaningful redaction is unavailable. And second, there remains the risk of future juror taint if the government elects to prosecute the mistrial count.