*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DALE ANTHONY SHERRILL,

      Defendant-Appellant.

UNPUBLISHED
June 15, 2023

No. 358371
Macomb Circuit Court
LC No. 2019-002487-FC

Before: SWARTZLE, P.J., and CAVANAGH and LETICA, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) and (2)(b) (victim less than 13 years of age and defendant more than 17 years of age), three counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a) and (2)(b) (victim less than 13 years of age and defendant more than 17 years of age), two counts of capturing or distributing an image of an unclothed person, MCL 750.539j(1)(b) and (2)(b), eavesdropping/installing a device, MCL 750.539d(1)(a) and (3)(a)(*i*), and aggravated indecent exposure, MCL 750.335a(1) and (2)(b).[1] The trial court sentenced defendant to 25 to 40 years' imprisonment for his CSC-I conviction, 57 to 180 months' imprisonment for each of his CSC-II convictions, 23 to 60 months' imprisonment for both of his capturing or distributing an image of an unclothed person convictions, 12 to 24 months' imprisonment for his eavesdropping/installing a device convictions, and 11 to 24 months' imprisonment for his aggravated indecent exposure conviction, with the sentences to be served concurrently, and 329 days' jail credit. It also ordered defendant to pay $544 in state costs, $130 to the crime victims fund, $600 in court costs, and $4,425 for his public defender. On appeal, defendant argues that (1) his trial counsel was ineffective by failing to adequately impeach the credibility of one of the victims at trial, (2) the trial court committed structural error requiring reversal by impaneling an "anonymous jury," (3) the statute allowing trial courts to impose court costs on defendants, MCL

---

[1] Defendant was acquitted of one count of CSC-II (victim less than 13 years of age and defendant more than 17 years of age).

769.1k(1)(b)(*iii*), is unconstitutional, and (4) the fees and costs defendant was ordered to pay violate the Michigan and United States Constitutions' Excessive Fines Clauses. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In this case, defendant was accused of sexually abusing two victims, his then-step daughter AM and AM's childhood best friend, CS. From 2008 to 2010, AM lived in a house in Richmond with her mother, defendant, and her half-sister, who is the biological daughter of defendant and her mother. From 2008 to 2010, AM's and CS's families lived next door to each other. During that time, AM and CS played together almost every day and CS regularly spent the night at AM's house.

CS alleged that defendant sexually abused her four times when CS was between the ages of six and eight years old. In the first instance of abuse, defendant was seated in a recliner in the living room in his home, and CS was sitting in his lap. No one else was in the room. Defendant began rubbing CS's thigh with his left hand, and then moved his hand up and rubbed CS's genitals over CS's clothes. CS climbed off defendant's lap and went to find AM to play. When the second instance occurred, CS was spending the night at AM's house and was sleeping on the floor next to AM's bed. CS woke up and defendant was rubbing her genitals over her clothes. In the third instance, CS was again sleeping on the floor next to AM's bed. CS awoke and defendant was rubbing CS's anus over her clothes. After both of the nighttime incidents, CS began crying, called her parents, and went home. In the fourth and final instance CS alleged, CS was riding on defendant's shoulders in the living room of defendant's house and no one else was in the room. CS alleged that, while she was on defendant's shoulders, defendant rubbed her thigh and then moved his hand up and rubbed her genitals over her clothes. CS asked defendant to put her down, and defendant did so. CS did not tell anyone about the abuse until several years later. In 2010 or 2011, AM moved with her family to Memphis, and CS moved with her family to Deckerville in 2011. CS and AM had very little contact after the age of eight when the two families moved apart.

AM was 12 years old when each of the incidents underlying defendant's convictions relating to AM happened. The charges against defendant stemmed from four incidents with AM, each of which occurred while they were living in the same house together in Memphis. AM did not remember the chronological order of the incidents. In the incident for which defendant was convicted of CSC-I, AM was taking a nap in defendant and her mother's bed and lying on her side. Defendant laid down behind AM, moved his hand underneath AM's underwear, and digitally penetrated her. Defendant's convictions of one count of capturing or distributing an image of an unclothed person and one count of eavesdropping/installing a device stemmed from defendant hiding a trail camera, which is a motion activated camera used for hunting, inside AM's bedroom. AM walked into her bedroom after taking a shower, wearing only in a towel, and discovered the trail camera on a shelf on her bedroom wall when she saw a red blinking light on the camera. AM told her mother that the trail camera was in her bedroom, her mother confronted defendant, and defendant removed the camera. In the incident for which defendant was convicted of one count of capturing or distributing an image of an unclothed person, defendant took photographs of AM while she was taking a shower. AM was washing her hair when she saw a camera flash. AM turned around and could see defendant's hair peeking out of the open bathroom door, which AM had closed before beginning her shower. Defendant took one or two more photographs and left before AM could confront him. In the incident for which defendant was convicted of aggravated

indecent exposure, AM awoke during the night and defendant was lying on the floor next to her bed. AM testified that there were multiple occasions that defendant slept on her bedroom floor. In this instance, AM saw that defendant's genitals were exposed and he was fondling himself.

In February 2016, defendant and AM's mother were in divorce proceedings, and AM's mother moved herself, AM, and her and defendant's daughter out of the house they shared with defendant. In the fall of 2018, CS learned that a family friend's eight-year-old stepdaughter had been sexually assaulted and the eight-year-old girl had told her parents right away. CS began to feel guilty about having never told anyone about the abuse she suffered. In mid-December 2018, CS told her parents that defendant had abused her, and her parents reported the abuse to the police. On January 7, 2019, CS was interviewed at the Macomb County Care House, which is a facility for child sex abuse victims to report crimes, and CS recounted the four incidents that formed the basis of the charges against defendant. After CS's Care House interview, Child Protective Services (CPS) went to the house of AM's mother and AM to speak with AM's mother about CS's report, and AM overheard the conversation from another room. AM had a brief conversation with her mother after CPS left, became upset, and left the house for a few hours. When AM came home, she told her mother that defendant had abused her without providing much detail. The next day, her mother reported what AM had told her to the police. On January 14, 2019, AM was interviewed at the Care House and told the interviewer about the numerous incidents in which defendant sexually abused her, not all of which resulted in charges against defendant. Defendant was arraigned on the charges in this case on August 8, 2019.

Defendant's trial began on June 21, 2021. Relevant to this appeal, the trial court instructed the potential jurors to not give their names on the record and jurors were referred to by juror number, rather than by name, through the whole trial. Defendant testified on his own behalf. Defendant denied ever having inappropriately touched CS, although he acknowledged he would sometimes look into AM's room during the night to check on AM and CS. Defendant denied touching AM in his bedroom in the Memphis house, ever having slept in AM's room or exposing himself, and taking photos of AM in the shower. However, defendant admitted that he put the trail camera in AM's room. Defendant explained that AM would get in trouble for staying up late at night in bed using her phone or a tablet, and defendant put the trail camera into her room to catch her using devices at night. Defendant believed that AM was making false allegations against him because he was a strict disciplinarian and that he had treated her mother badly in fights leading up to their divorce. Defendant similarly believed that CS was making false allegations because defendant would discipline CS when she was playing with AM.

The jury deliberated for less than three hours and convicted defendant on each charge except the CSC-II charge based on CS's allegations that defendant touched her while she was riding on his shoulders. The trial court sentenced defendant to the statutory minimum sentence of 25 to 40 years' imprisonment for defendant's CSC-I conviction, with sentences for his other seven convictions to be served concurrently. The trial court also sentenced defendant to pay $544 for state minimum costs, $600 for court costs, $4,525 for attorney fees, and a $130 crime victim rights assessment.

Defendant appealed by right in this Court his judgment of sentence. Defendant subsequently filed in the trial court a motion to correct an invalid sentence. Defendant argued that the portions of his sentence that requires him to pay state minimum costs, crime victim rights costs,

court costs, and public defender costs violate his federal and state constitutional due-process rights. The trial court denied defendant's motion regarding court costs and attorney fees. Thereafter, defendant moved in this Court for a remand to the trial court to hold a *Ginther*[2] hearing regarding whether defendant received effective assistance of counsel. Defendant argued that his trial counsel was ineffective by failing to impeach AM on the basis of her character for untruthfulness and inconsistencies between statements AM made in her Care House interview, her preliminary examination, and trial testimony. This Court entered an order remanding this case to the trial court for a *Ginther* hearing.[3]

The only witness to testify at the *Ginther* hearing was defendant's trial counsel. Trial counsel testified that he impeached AM directly on the inconsistencies between her preliminary examination testimony and her trial testimony. According to trial counsel, he had considered that there were three or four minor inconsistencies between AM's statements made in her Care House interview and AM's trial testimony. Trial counsel testified that he had always intended to impeach AM regarding her Care House interview, and he planned to do so by questioning the officer in charge of the case, Detective Julia Frantz, who observed the interview. However, trial counsel was unable to carry out that strategy because Detective Frantz testified that she was not familiar with the transcript from AM's Care House interview. Trial counsel abandoned his attempt to elicit evidence of the Care House interview transcripts. Trial counsel testified that he did not find another way to use the Care House interview transcript because he would have opened the door to allowing the prosecution to recall AM as a witness and impeaching AM, who was still a minor at the time, on minor differences between her statement and testimony, which may have left a negative impression with the jury. Also, AM asked the interviewer at the end of her Care House interview whether she had provided enough information and whether the interviewer believed her. Trial counsel explained that he did not pursue using AM's questions because he did not believe that doing so would have been impactful enough that the jury would have concluded AM was making up the allegations and the better strategy was to focus on the inconsistencies in AM's preliminary examination and trial testimony. The trial court denied defendant's motion for a new trial and concluded that defendant received effective assistance of counsel at trial. The trial court reasoned that defendant's trial counsel had a clear strategy to impeach AM's testimony to the maximum extent possible while minimizing the risk that AM would be recalled as a witness, and the trial court would not second-guess that strategy. Following the remand, defendant filed a supplemental brief with this Court.

## II. STANDARDS OF REVIEW

"A claim of ineffective assistance of counsel presents a mixed question of fact and constitutional law." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). Factual findings are reviewed for clear error and questions of constitutional law are reviewed de novo. *Id*. "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Antwine*, 293

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] *People v Sherrill*, unpublished order of the Court of Appeals, entered August 10, 2022 (Docket No. 358371).

Mich App 192, 194; 809 NW2d 439 (2011). Whether a statute is unconstitutional is a question of law that this Court reviews de novo. *People v Perkins*, 280 Mich App 244, 248; 760 NW2d 669 (2008). "Statutes are presumed to be constitutional, and a statute is to be construed in a constitutional manner unless the unconstitutionality of the statute is facially obvious." *People v Hrlic*, 277 Mich App 260, 262; 744 NW2d 221 (2007).

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied the effective assistance of counsel and is entitled to a new trial on that basis. We disagree.

"The right to counsel guaranteed by the United States and Michigan constitutions, US Const Am VI; Const 1963, art 1, § 20, includes the right to the effective assistance of counsel." *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010). "Effective assistance of counsel is presumed and defendant bears the burden of proving otherwise." *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "To establish ineffective assistance of counsel, defendant must first show that (1) his trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *People v Uphaus*, 278 Mich App 174, 185; 748 NW2d 899 (2008). Regarding the first prong of the two-part test, a defendant must establish the factual predicate of his ineffective assistance of counsel claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Trial counsel's performance does not fall below an objective standard of reasonableness when this Court can conceive of a legitimate reason for counsel's trial strategy. *People v Clark*, 330 Mich App 392, 427; 948 NW2d 604 (2019). However, "a court cannot insulate the review of counsel's performance by calling it trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). Regarding the second prong, under which a defendant must show his counsel's deficient performance prejudiced him, "[a] reasonable probability need not rise to the level of making it more likely than not that the outcome would have been different." *People v Grant*, 470 Mich 477, 486; 684 NW2d 686 (2004). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Chenault*, 495 Mich 142, 159 n 10; 845 NW2d 731 (2014).

Defendant argues that his trial counsel's performance fell below an objective standard of reasonableness because trial counsel did not elicit testimony on a number of issues, all of which relate to impeaching AM's credibility as a witness using statements AM and CS made in their Care House interviews or to police. First, defendant argues that his trial counsel should have impeached AM's credibility on the basis that AM had a reputation for untruthfulness. The credibility of a witness generally refers to whether the witness's testimony is worthy of belief. *People v Lukity*, 460 Mich 484, 490; 596 NW2d 607 (1999). A witness's character for truthfulness is an aspect of credibility. *Id*. Under MRE 608(a):

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Defendant argues that his trial counsel should have attacked AM's credibility by questioning CS about her Care House statement that AM stretched the truth "a lot" and the statement in Detective Frantz's police report that CS said AM had a habit of making things up.

Defendant has not established the factual predicate of his claim regarding AM's reputation for untruthfulness. Defendant's argument that AM had a reputation for untruthfulness relies only on CS's Care House statement and Detective Frantz's police report, and it is not clear from the excerpt of the police report in the record whether CS made a statement to Detective Frantz separately from CS's Care House interview. CS's Care House statement about AM's reputation for untruthfulness referred to the time that CS and AM were between the ages of about six and eight, and her statement referred to an incident in which defendant allegedly put his genitals near CS's face while she was sleeping, conduct for which defendant was not charged. CS and AM agreed that the two had very little contact after the age of eight. CS and AM did not go to school together after that age. AM was 12 years old when each of the incidents underlying defendant's convictions relating to AM happened. AM was 16 years old when she came forward with her allegations against defendant and gave her Care House statements, and AM was 18 years old when she testified at defendant's trial. Defendant has not brought forward any evidence that AM had a reputation for untruthfulness after the age of eight or at any time relevant to defendant's convictions for his conduct relating to AM. Without any evidence regarding AM's reputation for untruthfulness at any relevant time, defendant has failed to show that his trial counsel's performance fell below an objective standard of reasonableness by not impeaching AM's credibility on the basis of her reputation for untruthfulness.

Next, defendant argues that his trial counsel should have impeached AM on the basis of inconsistencies between her Care House statements, her preliminary examination testimony, and her trial testimony. Defendant has identified the specific inconsistencies that he believes his trial counsel should have pursued. At trial, AM testified that she was definitely in seventh grade when defendant touched her, but, in her Care House interview, AM said that she was either in seventh or eighth grade. Next, AM said in her Care House interview that defendant left the room first after the assault and she finished her nap, at the preliminary examination AM testified that she left the room first after the assault, and at trial AM testified that defendant left the room first and AM zipped up and buttoned her pants and then left the room. Regarding defendant's aggravated indecent exposure conviction, AM testified at trial that she saw defendant fondling his exposed genitals, but, during her Care House interview, AM said that defendant's genitals were exposed without mentioning defendant was fondling them. Also, defendant argues that his trial counsel should have elicited testimony regarding AM's questions at the end of her Care House interview, which were transcribed as "Do [yo]u believe me?" and "Do [yo]u have enough?" and that defendant's trial counsel should have called AM's Care House interviewer to testify regarding the interviewer's alternate hypotheses for the crimes, which were defendant was the wrong suspect and AM was attention-seeking.

"Decisions regarding whether to call or question witnesses are presumed to be matters of trial strategy." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). A claim of ineffective assistance based on such decisions requires that a defendant show his counsel's performance fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's deficient performance, the outcome would have been different. See *People v Jurewicz*, 506 Mich 914; 948 NW2d 448 (2020), quoting *Trakhtenberg*, 493 Mich at

51. Defendant's trial counsel testified at the *Ginther* hearing that he planned to introduce evidence of AM's inconsistent Care House statements by eliciting testimony about the statements from Detective Frantz, who watched the interview, but he was not able to do so because Detective Frantz testified that she had no knowledge of the Care House interview transcript. Defendant argues that after his trial counsel was unable to use extrinsic evidence of AM's inconsistent statements through Detective Frantz, trial counsel's trial strategy fell below an objective standard of reasonableness because counsel did not recall AM as a witness to impeach her with the Care House interview transcript.

Defendant's trial counsel explained that he did not pursue the inconsistencies between AM's Care House statement and her testimony for several reasons. Trial counsel did not believe the differences between AM's Care House statement and her testimony were meaningful enough to undermine AM's credibility. Trial counsel did not believe that AM's questions regarding whether she had provided enough information or whether the Care House interviewer believed her were enough to sway the jury regarding AM's credibility and he thought that attempting to impeach AM on the basis of minor details may have left a negative impression on the jury. Also, trial counsel testified that he did not want to give the prosecution another chance to question AM.

Trial counsel's decisions regarding the calling and questioning of witnesses were objectively reasonable. A reviewing court is in a uniquely poor position to question trial counsel's strategy for impeaching the testimony of victims when a defendant is facing criminal sexual conduct charges. This Court has no ability to assess the victims' demeanor during their testimony or the jury's reaction to their testimony. Trial counsel's decision to forgo questioning AM about the inconsistency between her Care House statement and trial testimony regarding the sexual assault was not unreasonable because trial counsel impeached AM on the inconsistency in her preliminary examination testimony, and AM's Care House statement was more similar to her trial testimony than to her preliminary examination testimony. The other differences between AM's Care House statements and her trial testimony were minor and would have been easily explainable. AM said in her Care House interview that she had tried to block the incidents out of her memory and was still trying to make sense of her memories during the interview.

Further, to call as a witness the Care House interviewer to testify regarding whether she believed AM would have been a risky strategy. There is nothing in the record to suggest that the interviewer did not believe AM, or that the interviewer's alternate hypotheses—that AM may be attention-seeking and that defendant may have been the wrong suspect—were given any serious weight. But, more importantly, it would have been improper for defense counsel to ask the forensic interviewer whether she believed what AM told her. See *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857, amended 450 Mich 1212 (1995) ("(1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty.") And, more generally, it is improper for a witness to comment or provide an opinion on the credibility of another witness; the issue of credibility is for the trier of fact. See *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985); see also *People v Douglas*, 496 Mich 557, 583; 852 NW2d 587 (2014) (quotation marks and citations omitted). Ultimately, trial counsel was in the best position to determine whose and what testimony would best sway the jury, and counsel offered principled explanations for his strategy. Trial counsel's strategy for calling and questioning witnesses did not fall below an objective standard of reasonableness.

Even if defendant could show that his trial counsel's performance fell below an objective standard of reasonableness, defendant cannot show that he was prejudiced to a point that would undermine confidence in the jury's verdict. Defendant relies heavily on the Supreme Court's analysis in *Trakhtenberg*, 493 Mich at 52-58. In that case, the defendant was accused of touching the genitals of his eight-year-old daughter and forcing his daughter to touch his genitals. *Id*. at 43. Although the failure of the defendant's trial counsel to fully impeach witnesses was one factor of the Court's analysis, the Court's overall conclusion that the defendant did not receive effective assistance of counsel was based on trial counsel's failure to investigate possible defenses. *Id*. at 58. The Court identified a number of specific actions by trial counsel that fell below an objective standard of reasonableness. First, defense counsel encouraged the defendant to waive his preliminary examination, leaving counsel without any information going into trial on the factual predicates of each of the charges and the prosecution's theory of guilt. *Id*. at 53. Second, defense counsel failed to interview key witnesses, which would have provided counsel with important context to presenting a defense, such as the facts that the victim's mother had animosity toward the defendant over divorce proceedings; an expert on defending criminal sexual conduct cases involving minors opined that the fact that the victim was interviewed on the allegations multiple times could lead her to believe that something happened that did not; and the defendant had previously applied ointment to the victim's genitals for medical purposes. *Id*. at 53-58. Third, defense counsel testified that, if she had learned that information, she would have used the information to impeach key witnesses and develop a record on how subjecting the victim to multiple interviews could lead her to believe something happened that did not. *Id*. at 54-55. The Court concluded the defendant was prejudiced because there were multiple avenues that counsel could have pursued, each of which would have tipped the scales of credibility in favor of the defendant, and those omissions were severe enough to undermine confidence in the jury's verdict. *Id*. at 58.

This case is distinguishable from *Trakhtenberg*. In this case, defendant does not argue that there is information defense counsel should have uncovered through investigation that would have strengthened his defense at trial. Defendant argues that his trial counsel did not make the best use of the information that counsel had. However, the strategies defendant argues on appeal that his trial counsel should have employed would not have benefited defendant's defense. Regarding AM's reputation for untruthfulness, defendant's theory of prejudice is not supported by the facts of this case. Defendant's trial counsel's strategy was to seek acquittal on all the charges against defendant on the basis that defendant's testimony was more credible than AM's and CS's testimony. To attack AM's credibility through CS's testimony, defendant would have been asking the jury to find that CS was credible regarding AM's character for untruthfulness, but that CS's testimony was not credible regarding her own allegations against defendant. It does not make sense that CS would make such serious false allegations against defendant and then undermine the credibility of AM, whose testimony would support that CS was telling the truth. Additionally, the sole allegation of AM's character for untruthfulness is in regards to AM telling CS, when the two were between the ages of six and eight years old, that defendant put his genitals in CS's face while she was sleeping. Although CS had doubts about whether AM told her the truth about the incident, a jury would likely be more inclined to believe that defendant had put his genitals near CS's face because that behavior is consistent with AM's allegations regarding the aggravated indecent exposure charge against defendant. Trial counsel's decision to not pursue CS's statement regarding AM's habit of stretching the truth as a child does not undermine confidence in the outcome of the trial.

Trial counsel's decision to not impeach AM regarding the inconsistencies between AM's Care House interview and testimony likewise did not prejudice defendant. Although the details defendant cherry-picks from the Care House interviews would tend to undermine AM's credibility, the prosecution would have been allowed to question AM and CS on their statements to provide context to the details defendant argues his trial counsel should have pursued. See *Lukity*, 460 Mich at 498-499. "A prosecutor may fairly respond to an issue raised by the defendant." *People v Brown*, 279 Mich App 116, 135; 755 NW2d 664 (2008). Also, when testifying, defendant made a blanket denial that he had ever touched AM. By doing so, defendant opened the door to rebuttal testimony on instances of related, uncharged conduct offered to discredit defendant's testimony. See *People v Dixon-Bey*, 321 Mich App 490, 519 n 6; 909 NW2d 458 (2017).

Unlike the situation in *Trakhtenberg* in which the additional information would have been exculpatory, AM's and CS's Care House interview statements would have shown that there were numerous allegations of criminal conduct that defendant was not charged for. In her Care House interview, AM did not only allege the conduct for which defendant was charged. AM described abuse that was ongoing from the age of four until AM was 12 or 13. AM stated that there were numerous instances that defendant touched her, but that she could only remember some of them with particularity. AM described two specific instances in which defendant touched her and an instance when defendant penetrated her. The prosecution did not charge defendant with crimes related to any of these incidents. Put into the context of the interview, AM's questions about whether she had provided enough information and the interviewer believed her suggest that AM was trying to provide as much information as possible and could not remember many more specific situations when defendant abused her. Therefore, if defendant's trial counsel had pursued using AM's and CS's Care House statements for purposes of impeachment, counsel would have opened the door for the prosecution to elicit testimony that would have been highly prejudicial to defendant. Defendant was not prejudiced by his trial counsel's decision to not impeach AM with the strategies defendant identifies on appeal.

Defendant has not established either that his trial counsel's performance fell below an objective standard of reasonableness or that he suffered prejudice. Accordingly, defendant's ineffective assistance of counsel claims fail.

## IV. ANONYMOUS JURY

Defendant argues that the trial court committed structural error requiring reversal of his convictions because he was tried before an anonymous jury. We disagree.

To preserve a challenge to the trial court's decision to refer to jurors by number rather than by name, a defendant must object to that decision in the trial court. *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007). Defendant did not preserve this issue for appellate review by objecting in the trial court to the trial court's decision to refer to jurors by number. An unpreserved issue is reviewed for plain error affecting substantial rights. *Id*. To establish plain error, a defendant must show that the "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness,

integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*.

A case is tried before an "anonymous jury" when certain biographical information about the jurors is withheld from the parties, typically to protect the jurors' physical safety from those who would use violence to influence the trial or to avoid public harassment of the jurors. *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000). The withholding of biographical information about jurors implicates two rights of the defendant: the right to engage in meaningful voir dire of the jury and the right to be presumed innocent. *Hanks*, 276 Mich App at 93. "In order to successfully challenge the use of an 'anonymous jury,' the record must reflect that the parties have had information withheld from them, thus preventing meaningful voir dire, or that the presumption of innocence has been compromised." *Williams*, 241 Mich App at 523.

Defendant argues that he was unconstitutionally tried before an anonymous jury because the jurors were referred to only by number and their names were never read into the record at trial. This Court has held that when jurors are referred to only by number, and not by name, a defendant must show that he was prejudiced in order to show his due-process rights were violated. *Williams*, 241 Mich App at 525. In *Williams*, the jurors were referred to by number during the trial, but the defendant knew the identities of the jurors because he had access to their juror questionnaires. *Id*. at 523-524. This Court determined that there was nothing from the record to indicate the defendant's ability to fully engage in voir dire was compromised. *Id*. at 524. This Court also concluded that there was no indication that the defendant's presumption of innocence was undermined because there was no evidence that the jurors perceived there was anything unusual about being referred to by number rather than by name. *Id*. Therefore, this Court held that the defendant was not entitled to a new trial because the defendant had not shown that he had been prejudiced. *Id*. at 525. This Court explained that the exclusive use of juror numbers at trial makes the jury anonymous in "the most literal sense," but the exclusive use of juror numbers does not, on its own, fall within the legal definition of an anonymous jury. *Id*. at 523.

Similarly, in *Hanks*, the jurors were referred to by number during the trial, but the defendant had access to the jurors' biographical information through the juror questionnaires. *Hanks*, 276 Mich App at 94. Applying the same reasoning as the *Williams* Court, this Court concluded that the defendant was not prejudiced by the use of the jurors' numbers because the defendant had not shown an inability to engage in voir dire or that the jurors saw any significance to the use of numbers rather than their names. *Id*. The *Hanks* Court also stated that it was not persuaded that *Williams* was wrongly decided on the basis of a subsequent decision of the Wisconsin Supreme Court, in *State v Tucker*, 259 Wis 2d 484, 501-502; 657 NW2d 374 (2003), which defendant also relies on in this case, that held a trial court may not refer to jurors only by number without justifying the anonymity of the jurors on the basis of actual danger posed to the jurors. *Hanks*, 276 Mich App at 95.

Although criminal defendants routinely argue on appeal in this Court that their constitutional due-process rights were violated by being tried before an allegedly anonymous jury, this Court's decisions in *Williams* and *Hanks* remain the only two published opinions of this Court to address the issue. *Hanks*, 276 Mich App at 95; *Williams*, 241 Mich App at 525. Since those two cases were decided, this Court has consistently applied the holdings that the exclusive use of numbers to identify jurors at trial does not render a jury anonymous when the defendant has access

-10-

to the jurors' questionnaires and there is no showing that the defendant's presumption of innocence was undermined.

Defendant does not argue that the withholding of jurors' names from the trial court record prejudiced him in a unique way under the facts of this case, and defendant does not argue that he was not able to effectively engage in voir dire. Rather, defendant raises the legal argument that anytime a court impanels a jury whose names are not in the record, without applying a strict legal standard to determine whether the facts of the case warrant the withholding of the jurors' names, the trial court has committed structural error requiring reversal. Defendant asks this Court to adopt the two-step test process required before impaneling an anonymous jury outlined in *United States v Thomas*, 757 F2d 1359, 1365 (CA 2, 1985), which most United States Circuit Courts of Appeals have adopted. "The decisions of intermediate federal courts are not binding on this Court, although they may be considered for their persuasive value." *People v Lucynski*, 509 Mich 618, 638 n 10; 983 NW2d 827 (2022). The Federal Circuit Courts of Appeals that have addressed this issue assume, without citation to authority, that withholding jurors' names is a drastic step.[4] To impanel an anonymous jury under *Thomas*, "there must be, first, strong reason to believe that the jury needs protection . . . ." *Thomas*, 757 F2d at 1365. To determine whether jurors need protection, defendant argues that a court should apply the so-called *Ross* factors, which are:

> (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment. [*United States v Ross*, 33 F3d 1507, 1520 (CA 11, 1994).]

After the trial court determines the jurors must be kept anonymous for their safety, "reasonable precaution must be taken to minimize the effect that such a decision might have on the jurors' opinions of the defendants." *Thomas*, 757 F2d at 1365. The reasonable precaution that must be taken to safeguard a defendant's presumption of innocence is generally for the trial court to provide jurors an "intelligent, reasonable and believable explanation" for why their names are being withheld that would not alert jurors to the fact that they may be in danger. *Id*. at 1364. An appropriate explanation may be that the jurors' names are being withheld to protect them from media scrutiny. *Id*. at 1365.

Defendant has not shown that a trial court's withholding from the record jurors' names would be detrimental to a defendant's right to engage in meaningful voir dire or the right to the presumption of innocence. The information withheld in anonymous jury cases generally relates to the ability to locate the juror outside of court, such as names, addresses, and places of employment. *United States v Crockett*, 979 F2d 1204 (CA 7, 1992). The federal cases defendant

---

[4] See, e.g., *United States v Shryock*, 342 F3d 948, 971 (CA 9, 2003) ("We recognize that empaneling an anonymous jury is an unusual measure . . . ."); *United States v Sanchez*, 74 F3d 562, 564 (CA 5, 1996) ("[T]he decision to empanel an anonymous jury . . . is a drastic measure . . . ."); *Ross*, 33 F3d at 1519 ("[T]he empanelment of an anonymous jury is a drastic measure . . . .").

cites to support his position do not address how the lack of knowing a juror's name, address, and employment information prevents meaningful voir dire. There is no indication that withholding that information from the trial record, especially when it has already been provided to a defendant, would prevent the defendant from asking any questions that would be relevant to determining whether a potential juror could fairly decide a case.

There is also no indication that referring to jurors only by number in a sexual assault case would undermine a defendant's presumption of innocence. When the Federal Circuit Courts of Appeals have considered anonymous jury cases, the defendants were typically accused of being involved in organized crime and committing violent acts. For example, in *Thomas*, the defendants were accused of committing "mob-style" murders and were charged with attempting to interfere with judicial proceedings by murdering witnesses. *Thomas*, 757 F 2d at 1364. In such a situation, the withholding of jurors' biographical information would suggest to the jurors that there must be at least some truth to the allegations against the defendant because steps are being taken to protect their identities, thus undermining the presumption of innocence. There is no such danger to the presumption of innocence in a sexual assault case. There is nothing regarding the withholding of the jurors' names that would suggest to the jury that the defendant is more likely to have committed the crimes for which he is charged. Accordingly, defendant has not shown that the federal cases on which he relies are persuasive in this case or that this Court should adopt the *Thomas* test and the *Ross* factors in this case.

Defendant next argues that failing to place jurors' names into the trial record without applying a strict standard rises to the level of structural error. "Structural errors are defects that affect the framework of the trial, infect the truth-gathering process, and deprive the trial of constitutional protections without which the trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *People v Watkins*, 247 Mich App 14, 26; 634 NW2d 370 (2001). "A structural error is intrinsically harmful regardless of the effect on the outcome and denies a defendant basic protections without which a trial cannot reliably serve as a vehicle for determining guilt or innocence." *Id*. In this case, defendant had access to the names of the jurors, so any error would have to stem from withholding jurors' names from the public. The Supreme Court has stated that "[o]ur cases have uniformly recognized the public trial guarantee as one created for the benefit of the defendant." *Gannett Co, Inc v DePasquale*, 443 US 368, 380; 99 S Ct 2898; 61 L Ed 2d 608 (1979). The public trial guarantee operates by allowing the public to scrutinize the prosecution and court's proceedings against the defendant to ensure the integrity of the trial. *Waller v Georgia*, 467 US 39, 46; 104 S Ct 2210; 81 L Ed 2d 31 (1984).

Although "[n]o right ranks higher than the right of the accused to a fair trial," the Supreme Court has held that jurors retain the right to a reasonable amount of privacy and that trial courts have the discretion to withhold certain juror information from the public. *Press-Enterprise Co v Superior Court of Cal, Riverside Co*, 464 US 501, 503, 512-513; 104 S Ct 819; 78 L Ed 2d 629 (1984). In *Press-Enterprise*, there had been a high-profile rape and murder case that garnered significant public attention. *Id*. at 503. After three initial days of voir dire in the case, the trial court closed public access to the next six weeks of voir dire to protect the jurors' privacy rights because the nature of the case forced jurors to answer highly sensitive questions. *Id*. After the conclusion of the trial, the media sought access to the voir dire transcripts and the trial court refused to unseal them to protect the jurors' privacy. *Id*. at 504-505. The Supreme Court held that there is a presumption that voir dire proceedings must be open to the public, but that a trial court has the

discretion to close certain proceedings to the public when there is "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id*. at 510. One higher value the Court specifically discussed is preserving the privacy of sexual assault victims, especially under circumstances in which the victim has never come forward, in order to avoid embarrassment or emotional trauma caused by disclosing such information to the public. *Id*. at 512. When a trial court closes voir dire proceedings, the court must make the transcript available to the public within a reasonable time, but the court may redact juror names or parts of the transcript. *Id*.

This Court considered a case in which the media sought access to the names and addresses of jurors that were withheld during trial, and concluded that the holdings in *Press-Enterprise* were primarily concerned with the openness of proceedings and not information about the jurors themselves. *In re Disclosure of Juror Names & Addresses*, 233 Mich App 604, 627-628; 592 NW2d 798 (1999). This Court held that, because jurors have rights to safety and privacy, the public only has a qualified right to access juror names and addresses. *Id*. at 630. There is no right for the public to know the identity of jurors during the trial; the public's right to know the identity of jurors only begins after the verdict has been rendered. *Id*. at 606. Further, a trial court does not have to make any particularized findings before deciding to withhold the identities of jurors from the public. *Id*. at 629. However, if the names and addresses of jurors are requested by media organizations after trial, a trial court must then articulate its reasons for withholding juror information to facilitate appellate review. *Id*. at 630. A trial court may withhold the names and addresses of jurors for as long as is necessary to protect jurors' safety and privacy. *Id*.

The trial court's decision to refer to jurors only by number at trial did not undermine the fairness or the integrity of the proceedings against defendant. This case differs from *Press-Enterprise* and *In re Disclosure* in the respect that those cases concerned the rights of the public rather than the rights of the defendants. *Press-Enterprise*, 464 US at 503; *In re Disclosure*, 233 Mich App at 606. However, there is no reason to suggest that viewing the issue from the perspective of a defendant would yield a different result. The trial court's procedure in this case appears to have been an intermediate measure to balance jurors' rights to privacy with defendant's right to open proceedings. Because of the sensitive nature of the questions jurors were asked during voir dire, the trial court had the discretion to close the proceedings to the public and only release a redacted transcript of voir dire. *Press-Enterprise*, 464 US at 512-513. However, the trial court kept the voir dire proceedings open to the public. Multiple prospective jurors had family members or people close to them who were sexual assault victims who had not come forward for personal reasons. All of the voir dire questions asked and answers given were in a public setting, were never sealed, and there is no indication that anyone ever sought or was denied access to the jurors' names. Defendant has not shown that he was prejudiced by the withholding of juror's names at trial. The trial court did not commit plain error affecting defendant's substantial rights when it withheld jurors' names during defendant's trial. Further, a trial court does not commit structural error when it refers to jurors by number only. Accordingly, defendant is not entitled to a new trial on this basis.

## V. CONSTITUTIONALITY OF MCL 769.1k(1)(b)(*iii*)

Defendant argues that MCL 769.1k(1)(b)(*iii*), the statute that authorizes trial courts to assess court costs on convicted defendants, is facially unconstitutional. We disagree.

-13-

Defendant brings a facial challenge to the constitutionality of MCL 769.1k(1)(b)(*iii*). "A facial challenge [to the constitutionality of a statute] involves a claim that a legislative enactment is unconstitutional on its face, in that there is no set of circumstances under which the enactment is constitutionally valid." *People v Wilder*, 307 Mich App 546, 556; 861 NW2d 645 (2014). MCL 769.1k provides, in pertinent part:

> (1) If a defendant enters a plea of guilty or nolo contendere or if the court determines after a hearing or trial that the defendant is guilty, both of the following apply at the time of the sentencing or at the time entry of judgment of guilt is deferred by statute or sentencing is delayed by statute:

> (a) The court shall impose the minimum state costs as set forth in section 1j of this chapter.

> (b) The court may impose any or all of the following:

> (*i*) Any fine authorized by the statute for a violation of which the defendant entered a plea of guilty or nolo contendere or the court determined that the defendant was guilty.

> (*ii*) Any cost authorized by the statute for a violation of which the defendant entered a plea of guilty or nolo contendere or the court determined that the defendant was guilty.

> (*iii*) Until May 1, 2024, any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case, including, but not limited to, the following:

> (A) Salaries and benefits for relevant court personnel.

> (B) Goods and services necessary for the operation of the court.

> (C) Necessary expenses for the operation and maintenance of court buildings and facilities.

This Court concluded that MCL 769.1k(1)(b)(*iii*) is constitutional in *People v Johnson*, 336 Mich App 688; 971 NW2d 692 (2021), lv gtd 509 Mich 1094 (2022). In that case, the defendant brought a facial challenge to the constitutionality of MCL 769.1k(1)(b)(*iii*), arguing that the statute denies defendants their due-process rights to be tried before an impartial decision-maker because judges are incentivized to convict defendants in order to impose costs to raise money to fund the courts. *Id*. at 692-693. The defendant also argued that MCL 769.1k(1)(b)(*iii*) violates the constitutional principle of the separation of powers between coordinate branches of government because the funding arrangement created by the statute prevents judges from accomplishing their constitutionally assigned function of assuring criminal defendants are afforded due process of law in the proceedings against them. *Id*. at 704. Defendant relies on those same arguments on appeal.

This Court rejected both of those arguments in *Johnson*, 336 Mich App at 704-705. In reaching its decision, this Court relied on three cases decided by the United States Supreme Court

addressing situations in which the mayor of a municipality was responsible for sitting as judge in cases of violations of local ordinances, the fines for convictions on those violations was paid toward the municipality's operating expenses, and the mayors had varying degrees of control over the expenditure of those funds.[5]  *Id*. at 696-698.  In *Johnson*, this Court identified the general principle for deciding cases in which the entity that levies fines also receives the revenue as follows:

> Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law. [*Id*. at 697, quoting *Tumey v Ohio*, 273 US 510, 532; 47 S Ct 437; 71 L Ed 749 (1927).]

This Court held that MCL 769.1k(1)(b)(*iii*) is constitutional because the Michigan Constitution prohibits judges from being paid from the revenue generated through assessing costs on convicted defendants and there is no direct nexus between the costs received and any particular expenditures. *Johnson*, 336 Mich App at 701-702.  This Court also rejected the argument that MCL 769.1k(1)(b)(*iii*) presents an unconstitutional violation of the separation of powers because the defendant had not met the burden of showing that there are no set of circumstances under which a trial court judge could not be impartial.  *Id*. at 704-705.

Even if defendant had offered persuasive arguments that were not rejected by the *Johnson* Court, this Court is presently prohibited from disturbing its holdings because the case is pending before the Michigan Supreme Court.[6]  "A panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule."  MCR 7.215(J)(1).  "[A] Supreme Court order granting leave to appeal does not diminish the precedential effect of a published opinion of the Court of Appeals."  MCR 7.215(C)(2).  Also, a special panel to consider whether an opinion of this Court was wrongly decided may not be convened after the Supreme Court has granted leave to appeal in the controlling case.  MCR 7.215(J)(3)(b).  Therefore, this Court is required to follow the holding that MCL 769.1k(1)(b)(*iii*) is constitutional as established in *Johnson*, 336 Mich App at 705. Defendant is not entitled to relief on this issue.

## VI.  EXCESSIVE FINES CLAUSE

Defendant argues that this Court should either vacate the costs and attorney fees imposed in his judgment of sentence or reverse the trial court's order to remit his prisoner funds to pay the costs and fees imposed on him on the basis that he is indigent.  We disagree.

---

[5] *Ward v Monroeville*, 409 US 57; 93 S Ct 80; 34 L Ed 2d 267 (1972); *Dugan v Ohio*, 277 US 61; 48 S Ct 439; 72 L Ed 784 (1928); *Tumey v Ohio*, 273 US 510; 47 S Ct 437; 71 L Ed 749 (1927).

[6] *People v Johnson*, 509 Mich 1094; 976 NW2d 862 (2022).

Because defendant did not preserve this issue for appeal by challenging the assessment of costs and fees against him at sentencing, we review this unpreserved issue for plain error affecting substantial rights. See *People v Konopka (On Remand)*, 309 Mich App 345, 356; 869 NW2d 651 (2015). As discussed, MCL 769.1k requires a trial court sentencing a convicted defendant to impose on the defendant minimum state costs and allows the trial court to impose fines authorized by statute, court costs, and attorney fees. MCL 769.1k(a) and (b). MCL 769.1*l* allows a trial court to order that any costs and fees imposed on an incarcerated defendant under MCL 769.1k shall be remitted to the court by deducting sums from the defendant's prisoner funds. MCL 769.1*l* provides, in pertinent part:

> If a prisoner under the jurisdiction of the department of corrections has been ordered to pay any sum of money as described in section 1k and the department of corrections receives an order from the court on a form prescribed by the state court administrative office, the department of corrections shall deduct 50% of the funds received by the prisoner in a month over $50.00 and promptly forward a payment to the court as provided in the order when the amount exceeds $100.00, or the entire amount if the prisoner is paroled, is transferred to community programs, or is discharged on the maximum sentence.

A defendant has the right to challenge the recoupment of costs and attorney fees by deduction of his prisoner funds on the basis that he is indigent. *People v Jackson*, 483 Mich 271, 292-293; 769 NW2d 630 (2009).

In *Jackson*, the Supreme Court considered whether an indigent defendant can be required to pay attorney fees that are assessed in the defendant's judgment of sentence. *Jackson*, 483 Mich at 274. Although *Jackson* only involved the recoupment of attorney fees, the Court indicated that the same rule applies to the recoupment of costs. *Id*. at 296. The Court held that a trial court is not required to assess a defendant's ability to pay costs and attorney fees when the trial court determines the amount it assesses on the defendant. *Id*. at 292. However, when a trial court enforces the imposition of costs and fees, due process requires that a defendant be given notice of the enforcement action and an opportunity to be heard to contest the enforcement. *Id*. A defendant has the right to challenge whether he can be forced to pay costs and fees on the basis of his ability to pay at the time the trial court enforces the defendant's obligation. *Id*. When a defendant makes a timely objection, the trial court is required to consider the defendant's indigent status and ability to pay the costs and fees at that time. *Id*. at 292-293. A trial court should "hold that a prisoner's individual circumstances warrant amending or reducing the remittance order when, in its discretion, it determines that enforcement would work a manifest hardship on the prisoner or his immediate family." *Id*. at 296-297. A trial court has the discretion to decide how it will adjudicate a claim that a defendant lacks the ability to pay costs and fees, and the court is not required to hold any formal proceedings. *Id*. at 297.

There is a statutory presumption that a prisoner is nonindigent. *Jackson*, 483 Mich at 295. By enacting MCL 769.1*l*, the Legislature created a statutory ability-to-pay threshold for determining whether a prisoner is indigent, which is that a prisoner has the ability to pay costs and fees when his prisoner receives funds in excess of $50 in a month. *Id*. The Supreme Court explained that this statutory framework passes constitutional muster because "a prisoner's 'living expenses' are nil, as the prisoner is clothed, sheltered, fed, and has all his medical needs provided

by the state." *Id*. However, a prisoner can rebut the presumption of nonindigence by showing "unique individual financial circumstances." *Id*. at 296. A prisoner bears a heavy burden of rebutting the presumption of nonindigence. *Id*. A trial court should reduce or rescind a remittance order only when the defendant's unique financial circumstances work "a manifest hardship on the prisoner or his immediate family." *Id*. at 296-297.

The specific relief that defendant seeks on appeal is for this Court to either rescind the trial court's order to remit defendant's prisoner funds and allow him to challenge in the trial court the enforcement of his assessed costs and fees or, alternatively, to vacate from defendant's judgment of sentence the portions of his sentence that assess costs and fees. Defendant is not entitled to either form of relief. Defendant's challenge to the trial court's order to remit defendant's prisoner funds is not ripe for appeal because defendant has not petitioned the trial court for relief on the basis of his inability to pay costs and fees. *Id*. at 298-299. A convicted defendant can petition the trial court for relief from the enforcement of costs and fee assessments at any time, *Id*. at 296 n 23, and defendant has not yet done so. According to the register of actions in this case, the trial court entered an order to remit defendant's prisoner funds on August 13, 2021, and the order was mailed to defendant on August 27, 2021, thus providing notice to defendant of the enforcement of his judgment of sentence regarding costs and fees. Defendant's motion to correct an invalid sentence only challenged the imposition of costs and attorney fees on the grounds that MCL 769.1k is unconstitutional. Defendant did not make an argument or offer proofs in the trial court regarding his indigent status or inability to pay the assessed costs and fees. During the trial court's hearing on defendant's motion to correct an invalid sentence, defendant did not raise the issue of indigency, and the trial court stated on the record that defendant had never challenged the enforcement of his obligation to pay costs and attorney fees. Accordingly, this Court cannot provide defendant relief on this issue. *Id*. at 297-298. However, defendant retains the right to challenge the recoupment of costs and fees from him in the trial court. *Id*. at 297 n 24.

Defendant is not entitled to have the assessment of costs and fees vacated from his judgment of sentence because defendant has abandoned his constitutional excessive-fines challenge on appeal. On appeal, defendant has made an argument with citation to authority to support his position that costs and attorney fees are fines for the purposes of the Eighth Amendment and Michigan's Excessive Fines Clauses. However, defendant has not made an argument regarding how an excessive-fines analysis would apply to the assessment of costs and fees generally, and, more importantly, defendant has not articulated how the costs and fees assessed against him are unconstitutional under the specific facts of this case. Failure to fully brief an issue on appeal constitutes abandonment of the issue. *People v McGraw*, 484 Mich 120, 131 n 36; 771 NW2d 655 (2009). "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims . . . ." *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001). Therefore, defendant has not met his burden of showing that the trial court committed plain error affecting his substantial rights when it assessed the court costs and fees defendant owes. See *Carines*, 460 Mich at 763. Accordingly, defendant is not entitled to relief on this issue.

Although defendant is not entitled to relief, assessed costs and fees are fines for purposes of the Excessive Fines Clause. The Michigan Constitution prohibits the imposition of excessive fines, Const 1963, art 1, § 16, and the prohibition on excessive fines contained in the Eighth Amendment to the United States Constitution was relatively recently incorporated under the

Fourteenth Amendment to apply to state action. *Timbs v Indiana*, ___ US ___, ___; 139 S Ct 682, 687; 203 L Ed 2d 11 (2019). This Court has not considered whether court costs and attorney fees are fines for the purposes of the Excessive Fines Clauses. Defendant argues that court costs and attorney fees are subject to the limitations of the Excessive Fines Clauses because they are only imposed on convicted defendants. The prosecution, on the other hand, argues that court costs and attorney fees should be considered as more akin to a civil remedy that compensates the government for the costs it has incurred through trying a defendant and providing representation.

Generally, "the Eighth Amendment places limits on the steps a government may take against an individual, whether it be keeping him in prison, imposing excessive monetary sanctions, or using cruel and unusual punishments." *Browning-Ferris Indus of Vt, Inc v Kelco Disposal, Inc*, 492 US 257, 275; 109 S Ct 2909; 106 L Ed 2d 219 (1989). The word "fine" means "a payment to a sovereign as punishment for some offense." *Id*. at 265. The Excessive Fines Clause applies to "fines directly imposed by, and payable to, the government." *Id*. at 268. Fines resulting from both criminal and civil proceedings are subject to scrutiny under the Excessive Fines Clause. *Hudson v United States*, 522 US 93, 103; 118 S Ct 488; 139 L Ed 2d 450 (1997). A civil cost imposed on a party does not implicate the Excessive Fines Clause when it "solely" serves a remedial purpose. *Austin v United States*, 509 US 602, 621-622; 113 S Ct 2801; 125 L Ed 2d 488 (1993). A cost imposed in a civil proceeding initiated by a governmental entity against an individual is remedial when its purpose is only to compensate the government for losses. *United States v Bajakajian*, 524 US 321, 329; 118 S Ct 2028; 141 L Ed 2d 314 (1998). However, the Excessive Fines Clause is implicated in civil proceedings in which the cost imposed serves, at least in part, a punitive purpose. *United States v Ursery*, 518 US 267, 281; 116 S Ct 2135; 135 L Ed 2d 549 (1996).

Costs and fees are subject to the Excessive Fines Clause because they are in part punitive despite having remedial purposes. Our Supreme Court acknowledged that costs and fees are part of the judgment against a defendant. *Jackson*, 483 Mich at 283. Fees and costs are only imposed on convicted defendants, and the costs and fees are imposed at sentencing. MCL 769.1k(1). Although minimum state costs must be assessed, the trial court has discretion regarding whether to assess fines, court costs, and attorney fees as part of a defendant's sentence. MCL 769.1k(1)(a) and (b). Unlike a purely civil debt, a trial court may imprison a defendant for nonpayment of costs. MCL 769.1k(10).

The United States Supreme Court has addressed the distinction between court costs and fines and concluded that there is no constitutional distinction between the two for the purposes of enforcing payment. *Williams v Illinois*, 399 US 235, 240-241; 90 S Ct 2018; 26 L Ed 2d 586 (1970). In *Williams*, the defendant was convicted of petty theft and sentenced to the statutory maximum sentence, which was a one-year term of confinement, a $500 fine, and $5 in court costs. *Id*. at 236-237. The judgment provided that, if the defendant's fine and court costs were unpaid at the end of his term of confinement, he would remain in jail until the fine and costs were paid and receive a credit of $5 a day spent in jail toward the fine and costs. *Id*. at 237. Because the defendant was indigent and had no means to pay the fine and court costs, the defendant faced a maximum term of confinement of the statutory maximum term plus 101 days. *Id*. The Court held that the sentencing scheme violated the Equal Protection Clause of the Fourteenth Amendment because the defendant was confined beyond the statutory maximum term on the basis of his status as indigent. *Id*. at 240-241. Regarding the distinction between a fine and the assessment of court costs, the Court stated:

What we have said regarding imprisonment for involuntary nonpayment of fines applies with equal force to imprisonment for involuntary nonpayment of court costs. Although the actual amounts prescribed for fines and court costs reflect quite different considerations, the purpose of incarceration appears to be the same in both instances: ensuring compliance with a judgment. Thus inability to pay court costs cannot justify imprisoning an indigent beyond the maximum statutory term since the Equal Protection Clause prohibits expanding the maximum term specified by the statute simply because of inability to pay. [*Id.* at 244 n 20 (citation omitted).]

Although the assessment of costs and fees serves a remedial purpose, both the Michigan and United States Supreme Courts have determined that costs and fees are part of the judgment against a defendant and enforceable as part of the judgment, which includes jailing a defendant without a separate finding of guilt. Accordingly, the assessment of costs and fees is at least in part punitive. Therefore, the assessment of costs and fees is subject to scrutiny under the Excessive Fines Clause. *Ursery*, 518 US at 281. The costs and fees imposed on defendant are fines for purposes of the Excessive Fines Clause. However, defendant has not showed he is entitled to relief from this Court with regard to the enforcement of the costs and fees he was sentenced to pay.

Affirmed.

/s/ Brock A. Swartzle
/s/ Mark J. Cavanagh
/s/ Anica Letica